**PRINCESS HOUSE, INC.,**
**Plaintiff/Counterdefendant,**

v.

**Rita LINDSEY, et al.,**
**Defendants/Counterclaimants.**

**No. 91–0640–CV–W–2.**

United States District Court,
W.D. Missouri,
Western Division.

Aug. 10, 1994.

W. Russell Welsh, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, Timothy J. Sear, Polsinelli, White, Vardeman & Shalton, P.C., Overland Park, KS, George W. Mykulak, Gary Greenberg, Goldstein & Manello, P.C., Boston, MA, Charles A. Gilman, Janet A. Beer, Cahill, Gordon & Reindel, New York City, James Sandnes, Corbin, Silverman & Sanseverino, New York City, for plaintiff.

Stephen G. Mirakian, Wyrsch, Atwell, Mirakian, Lee & Hobbs, P.C., Kansas City, MO, Timothy J. Dacey, III, Hill & Barlow, Boston, MA, Thomas W. Davis, II, James J. Jimmerson, Jimmerson, Davis & Santoro, Las Vegas, NV, Ronald Dean Lee, Wyrsch,

Atwell, Mirakian, Lee & Hobbs, P.C., Kansas City, MO, for defendants.

W. Russell Welsh, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, Timothy J. Sear, Polsinelli, White, Vardeman & Shalton, P.C., Overland Park, KS, for Ellen Anderson.

## ORDER

GAITAN, District Judge.

## I. INTRODUCTION

Plaintiff, Princess House, Inc., (Princess House) manufactures and sells crystal products through what is known as the "home party plan" sales method where independent contractor salespersons known as "consultants" demonstrate and take orders for merchandise at "parties" in private homes. Defendants Rita Lindsey, Herb Lindsey, and Debbie Kraft (hereinafter, the "Lindseys") were sales organizers for Princess House's sales. As sales organizers, the Lindseys recruited consultants. While consultants are paid commission on their sales, organizers receive commission on their sales and "overwrite" payment on the sales of the consultants they recruit.

While still organizers for Princess House, the Lindseys also began to work for Park Lane, Inc., (Park Lane) another company using the home party plan to sell costume jewelry. The Lindseys conducted meetings in Kansas, Illinois, and Missouri with their Princess House consultants. After these meetings many of Princess House's consultants signed contracts to sell Park Lane products and Princess House alleges that as a consequence, it lost much of its sales force. Sometime after the meetings between the Lindseys and the Princess House consultants, Princess House terminated its relationship with the Lindseys.

Princess House brought two actions in U.S. District Court in Massachusetts: (1) against Park Lane for willful contempt of a previous consent decree issued by the District Court in Massachusetts which enjoined Park Lane from recruiting Princess House sales people and (2) this action, which was transferred to this court, against the Lindseys. Princess House's Complaint against the Lindseys alleges six counts: (1) breach of an express contract prohibiting disclosure of confidential and proprietary information; (2) breach of a "separate implied in fact contract" not to use the proprietary and confidential information of Princess House to its detriment; (3) breach of an implied covenant of good faith and fair dealing by disclosing and misusing confidential and proprietary information; (4) tortious interference with the existing and prospective contracts between Princess House and other salespersons within the Princess House organization; (5) tortious interference with the existing and prospective business relationships between Princess House and other salespersons within the Princess House organization; and (6) misappropriation and wrongful use of plaintiff's trade secrets.

The Lindseys filed a counterclaim against Princess House and a Princess House organizer, Ellen Anderson. The court previously granted Anderson's motion to dismiss the claims against her. The remaining counterclaim against Princess House is based on the Lindseys' termination and alleges twelve cause of action: (1) breach of contract, (2) breach of implied covenant of good faith and fair dealing, (3) intentional interference with prospective economic advantage, (4) antitrust violations, (5) wrongful denial of contract, (6) intentional infliction of emotional distress, (7) fraud, intentional misrepresentation, (8) negligent misrepresentation, (9) civil RICO, (10) wrongful termination, (11) breach of public policy, and (12) abuse of process.

Currently pending before the court are the Lindseys' motion for summary judgment on Princess House's claims and Princess House's motion to dismiss and/or for summary judgment on the counterclaims.

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether there exists a *genuine* issue of *material* fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. The party moving for summary judgment has the burden of proving that these requirements for summary judgment have been met. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. *Sheline v. Dun & Bradstreet*, 948 F.2d 174, 176 (5th Cir.1991).

If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Factual disputes that are collateral to the substantive law will not preclude summary judgment. *See id.*

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine. A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. *Id* at 249, 106 S.Ct. at 2510–11. When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 255, 106 S.Ct. at 2513–14. If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552–53. If the moving party meets the requirement, the burden shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The trial judge then determines whether a trial is needed. "[W]hether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

## III. ANALYSIS

### A. Defendants' Motion for Summary Judgment

The Lindseys move for summary judgment on all of Princess House's claims.

### 1. Breach of Express Contract

Princess House bases its first claim for relief on breach of an express contract. While written contracts existed between each of the Lindseys and Princess House, some of these contracts were no longer in effect at the time that the alleged breaches of contract occurred.

The written contract which existed between Herb Lindsey and Princess House was entered into on November 15, 1976. It stated, "[t]his agreement shall terminate ten years (10) from the date hereof." Thus, the contract expired on November 15, 1986. Although the contract provided for renewal by Lindsey, there is no evidence that it was renewed. Therefore, Princess House cannot base a breach of contract claim on this written agreement.

Debbie Kraft also signed a contract with Princess House which expired ten years from the date of the agreement. Kraft signed the contract with Princess House on March 13, 1972. Therefore, this agreement expired on March 13, 1982. While it too had provisions

for renewal by Kraft, there is no evidence that renewal occurred.

Kraft, however, signed another contract with Princess House on December 12, 1986, which was apparently still in effect at the time of her alleged breach. Moreover, Rita Lindsey's contract also appears to have been in effect at the time of the alleged breach. Thus, only the 1986 written agreement between Debbie Kraft and Princess House and Rita Lindsey's written agreement with Princess House are relevant to the breach of express contract claims.

Princess House claims that the Lindseys breached the agreements by (1) improperly using information obtained in their roles as Organizers to recruit from within Princess House; (2) failing to provide positive motivation, training and support for their consultants; (3) and depriving Princess House of its sales force by recruiting consultants from within the Princess House sales structure to sell Park Lane products.

 Nowhere in the contracts at issue are there provisions regarding motivation, training, and support. Furthermore, there are no prohibitions on recruiting Princess House consultants to sell other products. Therefore, the court finds that the Lindseys' alleged failure to motivate, train, and support, and their recruiting do not violate the express terms of the contracts.

Princess House also alleges that the Lindseys improperly used Princess House information during their recruitment of consultants for Park Lane. Rita Lindsey's contract states in relevant part:

> The Dealer agrees that she (he) will not at any time during the term of this agreement or thereafter disclose to any person, firm, or corporation, any information received or acquired by her (him) during the term of this agreement relating to the business, sales records, customers, employees and representatives, and financial and other affairs of Princess House, Inc.

Debbie Kraft's 1986 contract states in relevant part:

> Proprietary Information. All data, literature and information in any form, provided by Princess House to the Consultant will be considered proprietary/confidential data of Princess House ... and will not be used by the Consultant in any other business venture without the prior written consent of Princess House.

 With regards to the claim against Rita Lindsey, the court finds that an issue of fact exists as to whether a "disclosure" of Princess House consultants was made to Park Lane. Therefore, summary judgment on the breach of express contract claim against Rita Lindsey is denied.

 With regards to the claim against Debbie Kraft, however, the court finds no breach of express contract. Princess House has provided no evidence that Kraft used information "provided by Princess House" in recruiting Princess House consultants. The court concedes that whether Kraft used information "provided by Princess House" may be dependent upon the ownership of the information regarding the lists of organizers and consultants recruited by the Lindseys. At this juncture, however, the court will strictly adhere to the words of the contract and finds that Princess House did not provide Kraft with information regarding consultants and organizers.

Thus, the court provisionally grants the Lindseys' motion for summary judgment on Princess House's express breach of contract claim against Debbie Kraft subject to an offer of proof at trial that supports Princess House's allegations that Debbie Kraft used information "provided by Princess House".

### 2. Breach of Implied Contract

 Princess House's second cause of action is based on breach of implied contracts. The express contracts between Princess House and the Lindseys apparently governed the Lindseys status as consultants. The Lindseys, however, were also organizers within the Princess House hierarchy. Because there is no evidence of written contracts between the Lindseys and Princess House, nor can terms be implied from consultants' contracts, as to the Lindseys' status as organizers, the court finds that these relationships were apparently governed by oral agreements. The terms of these oral agreements are disputed by the parties. In addition, the Lindseys' alleged breach of these

agreements is dependent upon the ownership of the confidential information regarding Princess House consultants which is the crux of this lawsuit. Therefore, the court will deny the Lindseys' motion for summary judgment on this claim.

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing

Princess House's third claim for relief is for breach of the implied covenant of good faith and fair dealing. In its complaint, Princess House states that the Lindseys misused proprietary/confidential information, misappropriated trade secrets, and failed to perform their obligations to Princess House.

■■■■ Under Missouri law,[1] each party to a contract is subject to an obligation of good faith and fair dealing. *See Machine Maintenance v. Cooper Indus., Inc.*, 634 F.Supp. 367, 371 (E.D.Mo.1986). This implied covenant imposes upon each party the duty to do nothing destructive of the other party's right to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish its purpose. *Id.* at 372.

The court finds that these allegations are merely a reiteration of Princess House's claims for breach of contract. Because these allegations will be adjudicated as claims for breach of contract, the Lindseys' motion for summary judgment is granted.

### 4. Intentional Interference with Contractual and Business Relationships

■■ Princess House's fourth and fifth claims for relief are intentional interference

---

1. This court has diversity jurisdiction over the Lindseys' contracts claims. In a diversity action in federal court, the district court normally follows the choice of law rules of the state in which it sits in order to determine which state's substantive law applies. *Birnstill v. Home Sav. of Am.*, 907 F.2d 795, 797 (8th Cir.1990). Where an action is transferred, as this case, pursuant to 28 U.S.C. § 1404(a) (1988), however, the law of the transferor forum applies. *Dahlberg v. Harris*, 916 F.2d 443, 444 (8th Cir.1990). The Supreme Judicial Court of Massachusetts has adopted a hybrid approach to choice of law decisions combining the Restatement (Second) of Conflict of Laws § 188 with numerous other choice of law approaches. *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 668–670 (1985). The court finds that the Massachusetts hybrid choice of law rule is not significantly different from the significant relationship test applied in Missouri. This court will, therefore, apply the most significant relationship choice of law analysis to the facts of this case.

To resolve a contract claim where the contract is silent on choice of law, § 188(2) of the Restatement provides that the following contacts should be considered: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. In considering the contacts listed in Section 188(2), the following factors are said to be relevant to the choice of the applicable rule of law: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. *Id.* § 6(2).

In this case, the contracts which existed between the Lindseys and Princess House did not provide for a choice of law. Princess House maintains that the law of Massachusetts governs the contract claims because the contracts were entered into by the parties in Massachusetts and Princess House is incorporated in and has its principal place of business in Massachusetts. The Lindseys contend that the law of the state of Missouri applies to the contract claims because the contracts were negotiated, executed, and largely performed in Missouri.

The court is unable to ascertain where the contracts at issue in this case were entered into. The court however, finds that Princess House advertised for independent contractors in Missouri and that negotiations between Rita Lindsey and Princess House occurred in Missouri. (Gillman Aff., Ex. 47, at 3, 4.) Furthermore, the contracts were performed in Missouri and other Midwestern states. Thus, it would appear that the parties, especially the Lindseys who did not leave Missouri to enter into this agreement, anticipated that the laws of Missouri would apply to the contracts. Furthermore, Missouri has an interest in protecting the contract expectations of its citizens. While it is conceded that Massachusetts also has an interest in protecting the contract expectations of its citizens, in this case Princess House, the court finds that, Princess House subjected itself to the laws of Missouri by soliciting independent contractors in Missouri. Thus, this court finds that the most significant relationships exist in Missouri and that the laws of Missouri should govern the contracts at issue in the case.

with present and/or prospective contractual and business relationships respectively. The elements of a claim for interference with economic advantage are: (1) a contract or valid business relationship or expectancy; (2) knowledge by the defendant of the contract or relationship; (3) intentional interference by the defendant which induces the breach of contract or relationship; (4) the absence of justification; and (5) resulting damage. *May v. Greater Kansas City Dental Soc'y*, 863 S.W.2d 941, 947 (Mo.Ct.App.1993). The court will consider these elements in light of the evidence presented.

■ Princess House has adduced sufficient evidence of and the Lindseys have admitted their knowledge of the existence of contracts between Princess House and some organizers and consultants which prohibited the sale of products from other direct sales companies. Furthermore, Princess House has established evidence that the Lindseys presented Park Lane business opportunities to Princess House consultants. This evidence sufficiently raises an issue as to whether the Lindseys induced Princess House consultants to breach their contracts by encouraging them to sell Park Lane products. Additionally, Princess House has established sufficient evidence regarding the Lindseys' absence of justification for their conduct and resulting damages.

Princess House also alleges a business relationship with organizers and consultants, to the extent that no contractual relationship existed. Moreover, Princess House claims that it maintained present as well as prospective contracts and relationships with customers and hostesses. Princess House, however, has presented no evidence that the Lindseys did anything which interfered with the alleged business relationships between it and its customers or hostesses.

■ Consequently, the Lindseys' motion for summary judgment is granted on Princess House's claims for tortious interference with present and/or prospective business relationships. The motion for summary judgment is also granted with regards to Princess House's claims for tortious interference with present and/or prospective contracts to the extent that these claims are based on business relationships with customers, hostesses, or consultants who were not contractually precluded from selling other products. The motion is denied with respect to Princess House's claims which are based on express contractual terms precluding consultants from selling other products.

## 5. Misappropriation and/or Wrongful Use of Trade Secrets

■ Princess House's sixth claim for relief alleges misappropriation and/or wrongful use of trade secrets. Princess House contends that its customer lists and the names and addresses of its consultants, organizers, and hostesses constitute valuable trade secret information pursuant to MASS. GEN.L. ch. 266 § 30. Under Massachusetts Law, the criteria considered in determining whether a trade secret exists are: (1) the extent to which the information is known outside of (the) business; (2) the extent to which it is known by employees and other involved in (the) business; (3) the extent of the measures take by (the employer) to guard the secrecy of the information. *Commonwealth v. Robinson*, 7 Mass.App.Ct. 470, 388 N.E.2d 705, 707 (1979). A crucial element in establishing the existence of a trade secret is a showing by the person or entity laying claim to the secret that proper and reasonable steps were taken to maintain the secret. *See id.* Princess House has set forth no evidence to establish that it took any precautions to maintain the secrecy of its customer lists or the names and addresses of its consultants, organizers, and hostesses. Consequently, the Lindseys' motion for summary judgment on this claim is granted.

## B. Plaintiff's Motion to Dismiss and/or for Summary Judgment on Defendants' Counterclaims

Princess House moves to dismiss or for summary judgment on all twelve causes of action in the Lindseys' counterclaim. The Lindseys concede dismissal of Claim 5 for wrongful denial of contract and Claim 9 under the Federal RICO statutes. Thus, the court will dismiss these claims. The court now addresses Princess House's motion to

dismiss with regards to the remaining causes of action.

### 1. Breach of Contract

The Lindseys bring a claim for breach of contract based on Princess House's "actions ... to take away [their] business." (Counterclaim at 10.) Princess House moves for summary judgment regarding the breach of contract claim on the grounds that the Lindseys have failed to plead the terms of the contract Princess House has allegedly breached or what actions comprise the alleged breach.

In their opposition to Princess House's motion for summary judgment, the Lindseys appear to allege the terms of contract are those in the written agreements they signed with Princess House. (Zuromski Aff., Exs. F–I.) In addition to the written terms of these contracts, the Lindseys' claim that there were also unwritten terms which they set forth in their opposition to Princess House's motion for summary judgment. (Opp. to Princess House's Mot. to Dismiss and/or for Summ.J. at 14–15.) Moreover, throughout their counterclaim, they allege that Princess House wrongfully terminated their overwrite payments. Therefore, the court finds that the Lindseys have satisfactorily pled the terms of the contracts and the actions which constituted their breach.

The court finds that Rita Lindsey cannot base her breach of contract claim on the written agreement with Princess House. Rita Lindsey's contract clearly states: "This agreement may be terminated by either party upon written notice given at least thirty (30) days prior to such termination." The Lindseys have acknowledged that Princess House gave them 30 days notice terminating their business relationship. (Counterclaim at 5.) Thus, Rita Lindsey's claim for breach of contract based on her written agreement with Princess House must fail.

Herb Lindsey's claim for breach of contract must also fail. The court has previously found that the written contract which existed between Herb Lindsey and Princess House expired on November 15, 1986 and was not in effect at the time of the alleged

breach by Princess House. Therefore, Herb Lindsey cannot base a breach of contract claim on this written agreement.

The court has similarly found that the contract Debbie Kraft signed in 1972 had also expired at the time of the alleged breach by Princess House. Kraft, however, also signed another contract with Princess House on December 12, 1986, which was apparently still in effect at the time of her termination by Princess House. This agreement stated: "this agreement may be terminated by ... Princess House during the initial term or any renewal term for breach of this agreement by not less than 30 days written notice." It has been conceded by Kraft that Princess House gave thirty days notice of her termination. However, in Part III.A.1. of this Order, the court found no evidence to indicate that Kraft breached the contract. Therefore, Princess House's motion for summary judgment on Kraft's breach of contract claim is denied.

While the court has determined that Rita and Herb Lindsey cannot bring a breach of contract claim based on their written agreements with Princess House, the court has previously found that these contracts governed their relationship with Princess House as consultants. The court has also found that the Lindseys status as organizers within the Princess House hierarchy was apparently governed by an oral agreement. The Lindseys have satisfactorily alleged and set forth affidavits regarding the terms and breach of this oral agreement. Thus, the court will deny Princess House's motion for summary judgment on the Lindseys' breach of contract claims as to these oral contracts.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

The Lindseys bring a claim for a breach of the implied covenant of good faith and fair dealing by alleging that Princess House discontinued payments of overwrites, disrupted their business relationship with regards to shipments and order processing, discontinued bonuses and other inducements, and terminated potential retirement benefits. (Counterclaim at 12.) The Lindseys claim that these actions go beyond mere breach of

contract and rise to the level of bad faith. Princess House contends, however, that these allegations amount to nothing more than a repetition of the breach of contract claim.

The court finds that the Lindseys' allegations of termination of overwrite payments, discontinuance of bonuses, and termination of potential retirement benefits are, essentially, breach of contract claims rather than breach of the covenant of good faith and fair dealing. Furthermore, to the extent that the Lindseys' claims of disrupted business with regards to shipments and order processing are recognizable as claims for a breach of the covenant of good faith and fair dealing, they have not alluded to any affidavits, depositions, answers to interrogatories, or admissions on file which substantiate these allegations. Consequently, because the Lindseys' claims are unrecognizable as breach of the covenant of good faith and fair dealing or entirely unsupported, summary judgment is warranted on this claim.

### 3. Interference with Prospective Economic Advantage

The Lindseys claim that Princess House tortiously interfered with two business relationships: (1) their relationship with Princess House consultants and (2) their relationship with prospective Park Lane consultants. As previously stated, the elements of a claim for interference with economic advantage are: (1) a contract or valid business relationship or expectancy; (2) knowledge by the defendant of the contract or relationship; (3) intentional interference by the defendant which induces the breach of contract or relationship; (4) the absence of justification; and (5) resulting damage. *May,* 863 S.W.2d at 947.

There is no liability for interference with a prospective business advantage unless a defendant interferes with a relationship between two other parties, that is, a defendant cannot be liable for "interfering" with his own prospective relationships. *See* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 130, at Supp. 141 (5th ed.1984 & Supp.1988). Princess House asserts that the Lindseys' claim regarding their relationship with other Princess House consultants must fail because Princess House is a party to those relationships. The Lindseys claim that the tripartite situation necessary for this claim exists because they were third party beneficiaries of contracts between their consultants and organizers and Princess House.

The Lindseys allege that Princess House interfered with the economic advantage of receiving overwrite payments on their recruits' sales. While the overwrite payments resulted from the sales of recruits, these payments were made by Princess House pursuant to the agreement which existed between Princess House and the Lindseys. Thus, the economic advantage, while dependent upon sales by the third party recruits, in essence existed between the Lindseys and Princess House. Thus, the court finds that the Lindseys' claim against Princess House for interference with their relationship with other Princess House consultants fails to state a claim and, thus, must be dismissed.

The Lindseys also claim that Princess House interfered with the business expectancy regarding their Park Lane business. The Lindseys allege that threats by Princess House to stop paying overwrite commissions to Princess House consultants who also sold Park Lane products prevented the Lindseys from maximizing their Park Lane income. The Lindseys contend that "most people considered selling Park Lane, but many limited their Park Lane efforts in light of Princess House's reaction." (Opp. to Princess House's Mot. to Dismiss and/or for Summ.J. at 22.)

The court examines this claim in light of the elements necessary for a claim for interference with economic advantage. Potential overwrites on the sale of Park Lane merchandise is a sufficient business expectancy for an interference claim. Furthermore, it is undisputed that Princess House had knowledge of the relationship that existed between the Lindseys and Park Lane. The Lindseys have failed, however, to provide evidence, beyond the pleadings and allegations in their opposition to Princess House's motion for summary judgment, which supports the con-

tention that Princess House impaired their receipt of overwrite payments by Park Lane. Furthermore, the Lindseys have failed to establish that the alleged interference was without justification and have failed to provide evidence of any damages resulting from the alleged interference. Consequently, Princess House's motion for summary judgment on the Lindseys' claim of interference with the economic advantage between the Lindseys and Park Lane is granted.

### 4. Anti–Trust Violations Under Federal Law

The Lindseys' fourth cause of action alleges anti-trust violations under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1988) and also under Sections 3, 4, and 5 of the Clayton Act, 15 U.S.C. §§ 14, 15, 16 (1988). The Lindseys allege that Princess House prevented and restrained competition, particularly that of Park Lane, in the sale and distribution of gift items through the home party plan of direct selling throughout the United States. The Lindseys claim that the conduct which constitutes these violations is Princess House's termination of contracts, discontinuance of overwrites, and entrance into a consent decree with Park Lane.

■■■■■ Section 1 [2] of the Sherman Act reaches unreasonable restraints of trade effected by a "contract, combination ... or conspiracy" between separate entities. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). It does not reach conduct that is "wholly unilateral." *Id.* Thus, the Lindseys' claims for violation of Section 1 of the Sherman Act must fail as to Princess House's termination of contracts and discontinuance of overwrites as these actions are unilateral conduct. The allegation of a Section 1 violation with regards to Princess House's entering into a consent decree with Park Lane, however, meets the requirement of separate entities.

The consent decree at issue was entered into by Princess House and Park Lane in the United States District Court for the District of Massachusetts on July 3, 1986. The decree placed specific restrictions on Park Lane's recruiting of Princess House consultants and organizers.

■■■■■ To prove that Princess House and Park Lane violated Section 1 of the Sherman Act by entering into the consent decree, the Lindseys must prove that entering into the decree fits within a class of restraints that has been held to be per se unreasonable or that entering into the decree violates what is known as the rule of reason test. *Flegel v. Christian Hosp., Northeast-Northwest*, 4 F.3d 682, 686 (8th Cir.1993). The Lindseys do not allege, nor does it appear that Princess House and Park Lane's conduct is a per se violation of Section 1.[3] Consequently, the Lindseys must prove that the terms of the consent decree between Princess House and Park Lane violate the rule of reason test.

■■■■■ Under the rule of reason analysis, a claim for unreasonable restraint on competition must provide evidence of either market power on the part of the defendant or actual detrimental effects of the alleged restraint on competition. *See Flegel* 4 F.3d at 688. The Lindseys have alleged that the consent decree prevented consultants and organizers from distributing Park Lane products and from dealing with the Lindseys. The Lindseys, however, have provided no evidence, other than their own allegations, that the consent decree had any actual detrimental effects on competition.

■■■■■ Absent a showing of actual detrimental effects on competition, the Lindseys must prove that Princess House possessed market power by identifying the relevant market for Princess House and Park Lane products and the effect of the consent decree on that market. *See id.* Relevant markets

---

**2.** Section 1 provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

**3.** Among the activities deemed to be per se violations of Section 1 are price fixing, tying arrangements, group boycotts, horizontal market divisions, and vertical market divisions. JULIAN O. VON KALINOWSKI, 2 ANTITRUST LAWS AND TRADE REGULATION § 6.02[1] (1990).

are defined in terms of both geography and product. *Id.* at 689.

■ The relevant geographic market is generally defined to be the geographic area of effective competition in which the product is traded. *Standard Oil Co. v. United States,* 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949). The Lindseys allege, and the court finds no evidence to the contrary, that the relevant geographic market is the entire United States.

■ The relevant product market is defined by those products which are reasonably interchangeable by consumers for the same use or between which cross-elasticity of demand[4] exists. *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 395, 400, 76 S.Ct. 994, 1007-08, 1009-10, 100 L.Ed. 1264 (1956). The Lindseys allege that the relevant product market is high quality gift items in which both Princess House and Park Lane products compete. While the Lindseys have provided evidence on market shares that both Princess House and Park Lane possess in the high quality gift market, they have failed to provide evidence that Princess House's crystal and giftware items are interchangeable for the same use as Park Lane's jewelry or that the sales of one product line is responsive to price changes in the other. As the Supreme Court stated in *Du Pont,* the seminal decision defining relevant markets, "[b]ecause most products have possible substitutes, [this court] cannot ... give 'that infinite range' to the definition of substitutes." *Id.* at 394, 76 S.Ct. at 1006 (citations omitted).

■ Failing to present evidence that Princess House products and Park Lane products are within the same relevant market, the Lindseys cannot demonstrate that the consent decree entered into by Princess

House and Park Lane was in violation of Section 1 of the Sherman Act. Consequently, Princess House's motion for summary judgment on this claim is granted.

■ The Lindseys also claim that Princess House's conduct violated of Section 2 of the Sherman Act.[5] Section 2 is violated by monopolizing or attempting to monopolize interstate commerce. To establish monopolization in violation of Section 2 requires a showing of: (1) the possession of monopoly power in the relevant market; and (2) the use of monopoly power to foreclose competition, gain competitive advantage, or destroy a competitor. *Trace X Chemical v. Canadian Indus.,* 738 F.2d 261, 265 (8th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). The elements of an attempted monopolization claim under Section 2 are: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anti-competitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Trace,* 738 F.2d at 265.

■ As previously discussed, the Lindseys have set forth insufficient evidence defining the relevant market in which it alleges Princess House committed anti-trust violations. Moreover, the Lindseys have failed to set forth any evidence that Princess House possessed monopoly power or that a dangerous probability of successfully implementing a monopoly existed. Consequently, Princess House's motion for summary judgment on the Lindseys' claim for violation of Section 2 of the Sherman Act is granted.

■ The Lindseys also allege counterclaims based on Sections 3, 4, and 5 of the Clayton Act. An analysis under Section 3[6] of the Clayton Act requires inquiry into the

---

4. Cross-elasticity of demand is defined as the responsiveness of the sales of one product to price changes of the other.

5. Section 2 provides in relevant part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C. § 2.

6. Section 3 of the Clayton Act provides in relevant part:

It shall be unlawful for any person engaged in commerce ... to lease, or make a sale or contract for sale of goods ... where the effect of such lease, sale, or contract for sale ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce. 15 U.S.C. § 14.

relevant market affected by the challenged agreement. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627–28, 5 L.Ed.2d 580 (1961). Because the Lindseys have set forth insufficient evidence defining the relevant market, their claim under Section 3 of the Clayton Act must fail. The Lindseys also allege claims based on Sections 4 and 5 of Clayton Act, however, these provisions apply only when sufficient antitrust claims are pled. Therefore, because the Lindseys' antitrust claims are insufficient, their Section 4 and 5 claims against Princess House also fail. Thus, Princess House's motion for summary judgment on the Lindseys' claims under the Clayton Act is granted.

### 5. Intentional Infliction of Emotional Distress

The Lindseys' sixth cause of action against Princess House is a claim of intentional infliction of emotional distress. The elements of this tort are: (1) conduct that is extreme and outrageous; (2) that is intentional or reckless; and (3) that results in severe emotional distress. *Hendrix v. Wainwright Indust.*, 755 S.W.2d 411, 412 (Mo.Ct. App.1988). The Lindseys' base this claim on Princess House's actions "to take away [their] business". (Opp. to Princess House's Mot. to Dismiss and/or Summ.J., at 23–24.) Princess House maintains that the Lindseys' allegations do not meet the requirement of extreme and outrageous conduct.

Extreme and outrageous conduct upon which a claim of intentional infliction of emotional distress may be based must be more than simply malicious or intentional. *J.R. v. P.B.A.*, 773 S.W.2d 235, 236 (Mo.Ct. App.1989). The conduct must be so extreme as to be beyond all possible bounds of decency and regarded as atrocious and utterly intolerable in a civilized community. *Id.* Missouri courts have stated that "it is for the court to determine, in the first instance, whether the defendants conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Frye v. CBS, Inc.*, 671 S.W.2d 316, 319 (Mo.Ct.App.1984).

If, after drawing all reasonable inferences in favor of the claimant, the court finds that the question of extreme and outrageous conduct is reasonably debatable, the issue should go to the jury. *Id.*

Upon review of the allegations set forth by the Lindseys regarding the termination of overwrite payments by Princess House, the court finds that this conduct may not reasonably be regarded as beyond all possible bounds of decency, atrocious, and utterly intolerable in a civilized community. Because the conduct of Princess House cannot reasonably be regarded as extreme and outrageous, this issue should not proceed to the jury and the Lindseys' claim for intentional infliction of emotional distress must fail. Princess House's motion for summary judgment on this claim is granted.

### 6. Fraud, Intentional Misrepresentation

The Lindseys' seventh cause of action is a claim for fraud. Princess House moves to dismiss this claim for failure to state the circumstances constituting fraud with particularity as is required by Fed. R.Civ.P. 9(b).[7] The Eighth Circuit has found that Rule 9(b) requires the time, place, content of the alleged false representations, as well as the identity of the person making the alleged misrepresentations to be stated in a claim for fraud. *See Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982). The court finds that the Lindseys' claim based on fraud fails to identify the persons who made the alleged misrepresentations and the place of these misrepresentations. Furthermore, the claim insufficiently states the time of the alleged misrepresentations as "at the time that Counterclaimants were recruited and thereafter." (Counterclaim at 18.) Consequently, the Lindseys have failed to plead fraud with the requisite particularity and, therefore, summary judgment on this claim is granted.

### 7. Eighth Cause of Action: Negligent Misrepresentation

The Lindseys' eighth cause of action alleges that Princess House negligently

---

7. Fed.R.Civ.P. 9(b) states in relevant part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

misrepresented to them that they would be independent contractors and were not subject to having their overwrite commissions taken away. The elements of a claim of negligent misrepresentation are: (1) defendant supplied information in the course of his business or because of some other pecuniary interest; (2) because of a failure by defendant to exercise reasonable care or competence, the information was false; (3) the information was intentionally provided by defendant for the guidance of a limited group, including plaintiffs, in a particular business transaction; and (4) in relying on the information, plaintiffs suffered a pecuniary loss.

■ The court finds that the Lindseys have satisfactorily alleged the elements necessary for their claim of negligent misrepresentation and that a genuine dispute of facts exists regarding these elements. Consequently, Princess House's motion for summary judgment on this claim is denied.

## 8. Wrongful Termination

The Lindseys' tenth cause of action is for wrongful termination. This claim, pled in the alternative, is based upon the existence of an "employment" relationship between the Lindseys and Princess House. The Lindseys claim that Princess House attempted to "assert employee-type control over the activities of the Lindseys and others." (Opp. to Princess House's Mot. to Dismiss and/or for Summ.J., at 33.) The Lindseys also claim that this attempt to control them "may have formed the basis for an employment relationship as opposed to an independent contractor relationship." (*Id.*)

■ The contracts which existed between Princess House and the Lindseys, state "under this Agreement you will be in business for yourself and will not be our employee or agent." Furthermore, the contract signed by Debbie Kraft in 1986 states "[c]onsultant is not an employee of Princess House and will not be treated as an employee with respect to services performed for federal tax purposes or otherwise." Thus, the court finds that there was no "employment" relationship between the Lindseys and Princess House and consequently, Princess House's

motion for summary judgment on the wrongful termination claim is granted.

## 9. Breach of Important Public Policy

■ The Lindseys allege, as their eleventh cause of action, wrongful termination, in violation of public policy. This cause of action is dependent upon an employment relationship. The court has previously found that no employment relationship existed between the Lindseys and Princess House. Therefore, Princess House's motion for summary judgment on this claim is granted.

## 10. Abuse of Process

■ The Lindseys allege abuse of process as their twelfth cause of action. To sustain an action for abuse of process under Missouri law, the facts must demonstrate an illegal and improper use of such process that is not warranted or authorized, an ulterior motive in exercising such process and damages. *Wells v. Orthwein,* 670 S.W.2d 529, 532 (Mo.Ct.App.1984). The test employed is whether the process has been used to accomplish some unlawful end or to compel the opposite party to do some collateral thing which he could not be compelled to do legally. *Id.* The Lindseys have set forth no such evidence which establishes their abuse of process claim. Thus, Princess House's motion on this claim is granted.

Accordingly, it is ORDERED that:

(1) defendants' motion for summary judgment is GRANTED in part and DENIED in part pursuant to this Order;

(2) plaintiff's motion to dismiss and/or for summary judgment on the counterclaims is GRANTED in part and DENIED in part pursuant to this Order;

(3) plaintiff's motion to strike the defendants' motion for summary judgment for failure to comply with Local Rule 13(g) is DENIED.