Gerald DAVIES, M.D., and Anesthesia & Pain Consultants P.C., Plaintiffs,

v.

GENESIS MEDICAL CENTER; Anesthesia & Analgesia, P.C.; Richard J. Leth, M.D.; Timothy J. Miller, M.D.; Janice K. Barker, M.D.; and Michael A. Swanson, M.D., Defendants.

No. 3–97–CV–20068.

United States District Court,
S.D. Iowa,
Davenport Division.

Feb. 12, 1998.

Brett A. Nelson, Rock Island, IL, for Plaintiffs.

Michael P. Byrne, Michael K. and William J. Bush, Davenport, IA, for Defendants.

## ORDER ON MOTION TO DISMISS

BREMER, Chief United State Magistrate Judge.

This matter is before the Court on Defendants' resisted Motions to Dismiss (Clerk's Nos. 9, 11, 30, and 31). The Court heard argument on the Motions on November 17, 1997. Appearing were Brett Nelson, Michael Byrne and William Bush. This matter is fully submitted.

### Table of Contents

I. Procedural Background.................................................1085
II. Standard for Motion to Dismiss......................................1086

III. Facts............................................................1086
IV. Discussion ......................................................1088
 A. Civil RICO (Count I)........................................1088
 1. Conduct of an Enterprise ...............................1088
 2. Pattern of Racketeering Activity .......................1089
 3. Proximate Cause .......................................1092
 B. Sherman Act Violations (Counts II and III) .................1092
 1. Standing ..............................................1092
 a. Antitrust Injury ...................................1093
 2. Section 1 Claim (Count II).............................1096
 a. Product Market ....................................1098
 b. Geographic Market and Market Power ................1099
 3. Section 2 Claim (Count III)............................1101
 C. Title VII (Count (IV) ......................................1102
 D. Supplemental State Claims (Counts V to IX) .................1102
 1. Iowa Antitrust Laws (Count V) .........................1102
 2. Counts VI to IX........................................1103
V. Conclusion ......................................................1103
Appendix A.........................................................1105

## I. Procedural Background

Plaintiffs' Complaint, filed April 18, 1997, and First Amended Complaint, filed April 24, 1997, contained the following counts: Count I, claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1964(c) (West 1984 & Supp.1996); Count II, claims arising under the Sherman Act, 15 U.S.C. §§ 1 and 2 (1994); Count III, tortious interference with a valid economic expectancy; Count IV, claims under the Health Care and Quality Improvement Act (HCQIA), 42 U.S.C.A. § 11112 (West 1991 & Supp.1996); Count V, breach of contract; Count VI, conspiracy under Iowa law; Count VII, defamation; Count VIII, intentional infliction of emotional distress; Count IX, negligent supervision; and Count X, breach of the duty of good faith and fair dealing.

On May 30, 1997, Defendant Genesis Medical Center (Genesis) filed a Motion to Dismiss (Clerk's No. 9), seeking dismissal of Counts I, II, IV, VII, and IX. Defendant Anesthesia & Analgesia (A & A) filed a Motion to Dismiss (Clerk's No. 11) on June 2, 1997, seeking dismissal of Counts I, II, and VII.

Plaintiffs filed a Second Amended Complaint on August 18, 1997, and a Corrected Second Amended Complaint on August 19, 1997. Both listed the following counts: Count I, RICO; Count II, Sherman Act, § 1; Count III, Sherman Act, § 2; Count IV, Title VII, 42 U.S.C.A. § 2000e to 2000e–17 (West 1991 & Supp.1996), ethnicity discrimi-

nation; Count V, Iowa antitrust laws, Iowa Code § 553.5 (1996); Count VI, intentional interference with contractual, prospective contractual, and business relations; Count VII, defamation; Count VIII, intentional infliction of emotional distress; and Count IX, breach of contract.

On September 8 and 9, 1997, Genesis filed a Motion to Dismiss the Corrected Second Amended Complaint and a Brief (Clerk's Nos. 29 & 30), which challenged Counts I through IV, and Count VII. On September 15, 1997, A & A filed a Motion to Dismiss the Corrected Second Amended Complaint and a Brief (Clerk's Nos. 31 & 35), joining in Genesis' Motion to Dismiss, and further alleging that Plaintiffs failed to state a claim under Count V.

In summary, the Court notes that all Defendants' motions to dismiss challenged the following counts: Count I, RICO; Count II, Sherman Act, § 1; and Count III, Sherman Act, § 2. Additionally, in response to claims either added or amended in the Corrected Second Amended Complaint, Defendants challenged the following claims in the second round of motions to dismiss: Count IV, Title VII; Count V, Iowa antitrust laws; and Count VII, Defamation. Defendants did not challenge the following claims: Count VI, intentional interference with contractual relations; Count VIII, intentional infliction of emotional distress; and Count IX, breach of contract. Some issues were raised and resolved through the pleadings process, and thus do not need further order from the

Court. By the Corrected Second Amended Complaint, Plaintiffs dismissed their HCQIA and negligent supervision claims (Counts IV and IX, respectfully, in the First Amended Complaint), which had been challenged in the first Motions to Dismiss (Clerk's Nos. 9 & 11).

## II. Standard for Motion to Dismiss

When considering a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), a court accepts all factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 163–65, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Springdale Educ. Assoc. v. Springdale Sch. Dist.*, 133 F.3d 649 (8th Cir.1998); *McSherry v. Trans World Airlines, Inc.*, 81 F.3d 739, 740 (8th Cir.1996). A court may dismiss a complaint only if it is clear no relief could be granted under any set of facts that petitioner could prove consistent with the allegations. *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 249–250, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *accord, Double D Spotting Service, Inc. v. Supervalu, Inc.*, 136 F.3d 554 (8th Cir.1998). "At a minimum, however, a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations." *Springdale Educ. Assoc.*, 133 F.3d at 651 (affirming district court's dismissal of complaint, where amended complaint did not allege facts that, if true, would be sufficient to demonstrate elements of claim).

In an antitrust case, the complaint's description of the defendant's acts must, however, be consistent with the alleged restraint of trade. *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir.1994).

As set forth in the Corrected Second Amended Complaint, the relevant facts are as follows.

## III. Facts

Plaintiff Gerald G. Davies, M.D. (Davies), is a licensed medical doctor and a board certified anesthesiologist. He is a shareholder in the other Plaintiff, Anesthesia and Pain Consultants, P.C. (APC), which is an Iowa professional corporation of licensed medical doctors formed in 1991 by Davies and Dr. John Dooley, not a party in this case. Davies and APC provide medical services, including anesthesiology services, to patients in the area known collectively as the Quad Cities, comprising Davenport and Bettendorf, Iowa, and Rock Island and Moline, Illinois. Before 1995, APC provided most of the cardiovascular and thoracic anesthesiology services at St. Luke's Hospital and its successor, Defendant Genesis Medical Center (Genesis).

Genesis is an Iowa non-profit corporation serving the Quad Cities area. Genesis was formed in June 1994, when St. Luke's Hospital and Mercy Hospital merged. Both hospitals are located in Davenport.

Defendant A & A is an Iowa professional corporation of licensed medical doctors.[1] Defendant Richard J. Leth, M.D., an anesthesiologist with medical staff privileges at Genesis, was president of the Anesthesia Department and chairman of the Anesthesia Service Committee (ASC) at Genesis, and he was a shareholder and president of A & A. Defendants Timothy J. Miller, M.D., Janice K. Baker, M.D., and Michael A. Swanson, M.D., are anesthesiologists with medical staff privileges at Genesis, shareholders of A & A, and members of the ASC. All Defendants provide medical services, including anesthesiology services, in the Quad Cities area.

In May 1993, Davies and Dooley announced plans to open an outpatient surgery center. In the same month, St. Luke's and Mercy Hospitals announced their intention of merging. Shortly after the announcement, St. Luke's began reorganizing its anesthesiology department from an open-staff to a closed-staff model. St. Luke's conducted a bidding process to select a single anesthesiology supplier.

Plaintiffs claim that in 1993 Defendants' began a campaign of character assassination under the guise of peer review. Plaintiffs allege that certain Defendants placed unfavorable reports in Davies' peer review file, and that Defendants were attacking Davies'

---

1. Plaintiffs do not state which Defendants participated in the alleged character assassination.

reputation in order to prevent the opening of his outpatient surgery center and eliminate competition in the market for cardiovascular anesthesiology in the Quad Cities and surrounding area.

St. Luke's Hospital opposed Plaintiffs' outpatient surgery center's application for a Certificate of Need in 1993.

In April 1994, A & A was formed.

On May 12, 1994, the Iowa Health Facilities Council granted a Certificate of Need to the outpatient surgery center. St. Luke's and Mercy Hospitals allegedly discouraged an owner from selling his real estate to Davies and his partners for the outpatient surgery center, and the hospitals allegedly suggested to real estate lenders that the project was not credit-worthy.

After St. Luke's and Mercy Hospitals merged to form Genesis Medical Center in June 1994, APC continued to provide most of the cardiovascular and thoracic anesthesiology services at Genesis. Genesis is the largest hospital in the Quad Cities area, and is the only hospital in the Quad Cities with facilities for invasive cardiology and cardiac surgery services.

In August 1994, APC and A & A reached an informal agreement to merge.

Genesis continued St. Luke's efforts to reorganize delivery of anesthesiology at the hospital. On October 12, 1994, Genesis issued a "Request for Proposal" to all anesthesiologists with medical staff privileges at Genesis, which included Davies. The request stated that any anesthesiology group and its members chosen to be the exclusive provider of anesthesiology services, "must agree not to directly or indirectly have an ownership interest in any other entity which renders one or more of the same services," provided by Genesis' anesthesiology department. Plaintiffs allege the bidding process was a sham, and that Genesis designed the request to give an exclusive contract to A & A. APC and A & A ceased work on their plans to merge.

In January 1995, Genesis awarded A & A the exclusive contract to provide anesthesiology services at Genesis.[2] Any anesthesiologist who wanted to work at Genesis had to work for A & A, and had to comply with the exclusive contract's prohibition against having an ownership interest in any other entity that rendered the same services as Genesis' anesthesiology department. These terms meant Davies or Dooley, who had financial interests in the outpatient surgery center, could not work at Genesis.

APC was forced to discharge some employees. Some APC members left to join A & A. At some point after obtaining the exclusive contract, A & A raised its prices.

On April 19, 1995, the exclusive contract prevented Davies from providing anesthesiology services at Genesis. On April 25, 1995, Defendants let Davies resume practice at Genesis on a temporary basis, but required him to sign an agreement stating APC would pay 5.5 percent of its net revenues to A & A. Plaintiffs do not state the reason that Davies ultimately stopped practicing at Genesis, or discontinued this contract, on February 4, 1997.

In September 1995, Genesis' Medical Executive Committee (MEC) suspended Davies for 31 days and imposed restrictions on his practice, permitting him to perform only emergencies or high-risk cardiac anesthesiology.[3] MEC told Davies the length of the suspension was based on an intent to report the suspension to the National Practitioner's Data Bank, which would inhibit Davies' ability to practice medicine elsewhere in the United States. Davies appealed the decision to the hospital's Judicial Review committee.

On January 12, 1996, the Judicial Review Committee reversed MEC's decision and held that Davies' suspension was unwarranted. On February 9, 1996, MEC appealed the Judicial Review Committee's decision to the Genesis Board of Directors, which appointed five of its members, none of whom were

2. The pleadings do not state the length of the contract, when it expires, or how it may be renewed.

3. At some unidentified time, but presumably before September 1995, the MES appointed three

of its members, not defendants in this case, to an ad hoc committee to investigate charges against Davies. The complaint alleges that the committee did not contact Davies, but interviewed his competitors and people hostile to him.

**1088**

doctors, to an Appellate Review Committee. On April 23, 1996, the Board adopted the MEC's report, imposing a .10–day suspension and restrictions on Davies' practice at Genesis. The complaint alleges that the restrictions were impractical, and were intended to prevent Davies from continuing to provide medical care at Genesis. It is unclear if or when the 10–day suspension was ever effectuated. None of the Genesis Board members who served on the Appellate Review Committee are named as defendants here.

Throughout the peer review process, Davies told the reviewers that his accusers had a personal stake in the review, and he asked to have his performance judged by outside peer reviewers. Plaintiffs allege certain unidentified Defendants denied these requests.

### IV. Discussion

#### A. Civil RICO (Count I)

Defendants allege that Plaintiffs have failed to state a claim for the violation of civil RICO.

"Any person injured in his business or property by reason of a violation of section 1962" may recover treble damages from the violator. 18 U.S.C. § 1964(c). Section 1962(c) states it is unlawful "for any person employed by or associated with," an enterprise as defined under RICO, "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); Atlas Pile Driving Co. v. DiCon Financial Co., 886 F.2d 986, 990 (8th Cir. 1989).

A "pattern of racketeering activity" includes two or more predicate acts in violation of various criminal statutes, including 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud). 18 U.S.C. § 1961; see Murr Plumbing, Inc. v. Scherer Bros. Financial Services Co., 48 F.3d 1066, 1069 (8th Cir.1995); Atlas, 886 F.2d at 990.

Standing to bring a civil suit under 18 U.S.C. § 1964(c) is limited to persons whose harm has been proximately caused by the commission of the alleged RICO predicate acts. Bowman v. Western Auto Supply Co., 985 F.2d 383, 386–87 (8th Cir.1993); DeWit

v. Firstar Corp., 879 F.Supp. 947, 962 (N.D.Iowa 1995).

Defendants assert Plaintiffs have not adequately plead the conduct and existence of a RICO enterprise; have not adequately pled predicate acts with the required specificity, and thus have failed to properly allege that Defendants engaged in a pattern of racketeering activity; and have not pled proximate cause.

#### 1. Conduct of an Enterprise

A RICO enterprise exhibits the following three characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering. United States v. Davidson, 122 F.3d 531, 534 (8th Cir.1997); United States v. Nabors, 45 F.3d 238, 240 (8th Cir.1995); Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 769–70 (8th Cir.1992). The "distinct structure" requirement focuses on "whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." Diamonds Plus, 960 F.2d at 770; Stephens, Inc. v. Geldermann, Inc., 962 F.2d 808, 815 (8th Cir.1992). The enterprise's common activities must extend beyond the minimal association necessary to sustain the pattern of racketeering. McDonough v. National Home Ins. Co., 108 F.3d 174, 177 (8th Cir.1997). The mere fact that each group member "carries on activities distinct from the pattern of racketeering is insufficient; the group as a whole must have a common link other than the racketeering activity." Id. (affirming dismissal of RICO claim, where plaintiffs failed to allege existence of structure distinct from minimal association necessary to defraud plaintiffs into buying defective land and homes; conclusory allegation that alleged enterprise consisted of more than what was necessary to defraud was insufficient).

An enterprise may be an association in fact, i.e., more than one entity or individuals that are associated although not a legal entity. See Davidson, 122 F.3d at 534; 18 U.S.C. § 1961(4).

■ To participate, directly or indirectly, in the conduct of an enterprise's affairs, a person must have some part in directing those affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 178–79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (affirming Eighth Circuit's "operation or management" test); *De Wit*, 879 F.Supp. at 964 (holding allegation that defendants conducted enterprise's alleged banking scheme was insufficient to allege conduct of enterprise's affairs, where defendants were not alleged to have had some part in directing affairs of enterprise itself).

Plaintiffs allege the existence of two RICO enterprises: (1) Genesis and A & A, and (2) "[c]ertain members of the Board of Directors of Genesis, certain members of the Medical Executive Committee, and certain members of the Anesthesia Service Committee." Plaintiffs allege each enterprise was "separate and distinct from the patterns of racketeering through which they managed or controlled the defendants." (Corr.Sec.Am.Compl. at 17, ¶ 76.)

Plaintiffs have not identified the persons included in the second alleged enterprise. They also have not identified any Defendant who participated in operating or managing the second enterprise, or described the nature of the operation or management by Defendants. In fact, Plaintiffs allege both enterprises managed or controlled the defendants.

■ The Court can reasonably infer from the pleadings that Genesis and A & A, as an association-in-fact enterprise, had a structure that was required to provide anesthesiology services at Genesis and that was distinct from the alleged pattern of racketeering activity. The Court also can reasonably infer from the facts pled that Genesis and A & A participated in the conduct of this enterprise's affairs.

■ The Court cannot, however, reasonably draw the same inferences about the second enterprise as pled. Plaintiffs have not alleged the existence of a structure distinct from the minimal association necessary to defraud Plaintiffs through the alleged fraudulent peer review. Plaintiffs' conclusory allegation that the alleged second association-in-fact enterprise consisted of more than what was necessary to defraud was insuffi-

cient to meet the pleading requirement. Furthermore, Plaintiffs have not alleged any defendant participated in the conduct of the second enterprise's affairs.

The Court holds the Plaintiffs' pleading regarding the second alleged enterprise is inadequate to establish the elements of an enterprise, and of conducting the enterprise's affairs. The Court therefore grants Defendants' Motion to Dismiss the claims in Count I concerning the second alleged enterprise.

### 2. *Pattern of Racketeering Activity*

■ A pattern of racketeering activity is present only when predicate acts are linked by two elements: continuity plus relationship. *H.J.*, 492 U.S. at 239. *Handeen v. Lemaire*, 112 F.3d 1339, 1353 (8th Cir. 1997). The relatedness element is satisfied by criminal acts that have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.*, 492 U.S. at 240; *Manion v. Freund*, 967 F.2d 1183, 1185 (8th Cir.1992). To establish a pattern, a plaintiff must show the predicate acts amount to, or otherwise constitute a threat of, continuing racketeering activity. *H.J.*, 492 U.S. at 240. Whether the predicate acts establish a threat of continued racketeering activity depends on the facts of each case. *H.J.*, 492 U.S. at 242.

Plaintiffs in this case alleged predicate offenses of mail fraud and wire fraud.

■ In all averments of fraud, including claims of mail and wire fraud as predicate acts in a RICO claim, circumstances constituting fraud must be stated with particularity. Fed.R.Civ.P. 9(b); *Murr Plumbing*, 48 F.3d at 1069; *DeWit v. Firstar Corp.*, 904 F.Supp. 1476, 1524 (N.D.Iowa 1995). Normally, the "circumstances" include "time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Murr Plumbing*, 48 F.3d at 1069. In a case such as this, however, where the plaintiffs do not allege the mail or wire fraud involve a misrepresentation of fact, the "circumstances" consist of the fol-

lowing four elements: (1) a scheme to defraud; (2) intent to defraud; (3) reasonable foreseeability that the mails (or wires) would be used; and (4) use of the mails (or wires) in furtherance of the fraudulent scheme. *See Murr Plumbing*, 48 F.3d at 1069 n. 6 (citing *Atlas*, 886 F.2d at 991); *accord, United HealthCare Corp. v. American Trade Ins. Co.*, 88 F.3d 563, 571 (8th Cir.1996); *Demerath Land Co. v. Sparr*, 48 F.3d 353, 356 (8th Cir.1995). The specificity with which fraud must be pleaded depends on the circumstances of the transaction. *Brown v. North Central F.S., Inc.*, 173 F.R.D. 658, 670 (N.D.Iowa 1997).

▮▮▮ When a complaint accuses multiple defendants of participating in a scheme to defraud, plaintiffs must identify which defendants were responsible for the separate acts of fraud. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir.1994); *De Wit*, 879 F.Supp. at 972; *see Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982).

▮▮▮ Plaintiffs allege scheme to defraud was a fraudulent peer review process initiated against Davies to control him and other APC physicians. Plaintiffs assert that Defendants used the mails and telephones in furtherance of their unlawful scheme on more than two occasions in the past ten years, and that Defendants had to use the mail and telephone to appear to comply with Genesis' bylaws and the HCQIA requirements for peer review. Plaintiffs state Defendants implemented their scheme against Davies in 1993, have used the scheme against other physicians, and that a threat of continued criminal activity exists.

Three paragraphs in the Corrected Second Amended Complaint present facts relating to the peer review:

17. Defendants Leth, Miller, Baker, and Swanson were four of the six members of the Anesthesia Service Committee ("ASC"). The ASC was and is responsible for anesthesia peer review. The ASC was controlled by A & A as five of the six members were shareholders in A & A.
. . . .

60. That unbeknownst to Dr. Davies a campaign of character assassination, under the guise of peer review, had begun in 1993 after Dr. Dooley and he had announced the idea of building an outpatient surgery center. The "character assignation" was clandestine at the outset, as the Defendants took highly critical positions regarding Dr. Davies' medical performance and judged Dr. Davies [sic] competency against the Defendants' subjective standard of care rather than an objective one. The Defendants "papered" Dr. Davies' peer review file with unfavorable reports that were based upon their subjective standards and contained unsubstantiated hearsay and rumor.
. . . .

67. That throughout his "peer review" Dr. Davies advised the peer reviewers that his accusers had a personal stake in the "review" and asked to have his performance judged by outside peer reviewers, but the Defendants denied these requests.

Corr.Sec.Am.Compl. at 5, 12–13, and 14.

Plaintiffs do not state which Defendants allegedly engaged in the fraudulent peer review scheme, or which Defendants engaged the alleged predicate acts of mail and wire fraud.[4] Plaintiffs do not state when the fraudulent peer review scheme took place, or describe any circumstances surrounding the place, manner, or scope of the mail and wire fraud, including the fraudulent scheme. Are Plaintiffs alleging the fraudulent peer review occurred only in 1993 when the "campaign of character assassination, under the guise of peer review" began? (Corr.Sec.Am.Compl. at 12, ¶ 60.) Or are Plaintiffs alleging the fraudulent scheme included the unspecified time period when the MEC's ad hoc committee investigated allegations against Davies? (*Id.* at 6, ¶ 23.) Possibly, but they may be

---

**4.** At the hearing on this matter, Plaintiffs argued, in another context, that the defendants on the ASC were acting as A & A's agents. If the Defendants on the ASC were responsible for the acts alleged to be mail and wire fraud, A & A and Genesis cannot be held responsible on a theory of respondeat superior. *Luthi v. Tonka Corp.*,

815 F.2d 1229, 1230 (8th Cir.1987) (declining to apply respondeat superior doctrine to RICO claims); *Prochaska & Assocs., Inc. v. Merrill Lynch Pierce Fenner & Smith*, 798 F.Supp. 1427, 1431 (D.Neb.1992); *K & S Partnership v. Continental Bank*, 127 F.R.D. 664, 669 (D.Neb.1989).

alleging that the scheme encompassed activities in 1996, as evidenced by paragraph 67, quoted above, which refers generally to "peer review," and follows several paragraphs describing actions by the MEC and the Judicial Review Committee. (*Id.* at 13–14, ¶¶ 62–66.) Plaintiffs' allegations supply *no information* regarding the identity of the other physicians purportedly harmed by the alleged scheme of fraudulent peer review, or of the circumstances, including the time frame, of such acts.

Nothing in the Corrected Second Amended Complaint, other than Defendants' conclusive assertions, suggests the peer review process was fraudulent. Plaintiffs allege Defendants engaged in character assassination and took critical positions of Davies' medical performance based on subjective judgments of his competency. Plaintiffs claim Defendants placed in Davies' peer review file unfavorable reports based on subjective judgments and unsubstantiated hearsay and rumor. Some or all Defendants allegedly attacked Davies' reputation and the public's view of his character to eliminate him from the competitive market of cardiac anesthesiology. Again, Plaintiffs do not identify which defendants were responsible for these acts.

Moreover, Plaintiffs do not set forth any content of any specific statements made by any defendant about Davies' performance, competence, or character. There is nothing obviously false about subjective judgments, disparaging or offensive comments, hearsay or rumors. *Cf. Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1330 (7th Cir.1994) (affirming dismissal of complaint; holding competitor's statement in trade magazine regarding "rip-offs," although perhaps disparaging to manufacturer, did not rise to level of fraud that would support RICO claim, where there was nothing obviously false about these statements; followed on other grounds by *De Wit*, 879 F.Supp. at 973). Plaintiffs do not state which statements are allegedly false, which allegedly false statements were made by particular defendants, or to whom the allegedly false statements were made.

The Board suspended Davies and placed restrictions on his staff privileges, which indicates that generally the statements were not obviously false, although certain defendants may have taken an aggressive posture toward Davies. See *Jepson*, 34 F.3d at 1330 (holding even to extent one or two statements defendant purportedly made may have contained misrepresentations, they were insufficient to establish pattern of racketeering RICO requires). Plaintiffs have not alleged the content of any misrepresentations that reasonably could be characterized as fraud. See *Demerath*, 48 F.3d at 355 (holding mere labeling of representations as fraudulent did not make them so without evidence to support assertion). The Corrected Second Amended Complaint fails to allege with particularity either the falsity of the alleged misrepresentations or the defendants' knowledge of such falsity. See *Brown*, 173 F.R.D. at 670. Plaintiffs thus have failed to adequately allege mail and wire fraud in furtherance of an alleged fraudulent scheme. See *Vicom*, 20 F.3d at 778; *De Wit*, 879 F.Supp. at 973.

Furthermore, hospital bylaws and HCQIA regulations required the use of certain notice procedures,[5] which were apparently followed through the alleged predicate acts involving the mail and telephones. Plaintiffs do not allege any predicate acts other than compliance with these requirements. Plaintiffs' attempts to characterize commonly accepted hospital procedures as racketeering are insufficient alone to plead a pattern of racketeering activity, where Plaintiffs have not adequately pled a fraudulent scheme. *Cf. Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 981 (8th Cir.1991) (holding fact bank had problem loans in past and moved to protect its position in regard to current problem loan did not alone indicate pattern of racketeering; "Bankers do not become racketeers by acting like bankers").

Plaintiffs' general allegations fail to apprize Defendants of the claims against them and the acts relied on as constituting the

**5.** The HCQIA provides qualified immunity from damages actions for hospitals, doctors and other participants in professional peer review proceedings, if the participants have met certain standards, including affording adequate notice and hearing procedures to the physician under review. *Brown, M.D. v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir.1996); *see* 42 U.S.C. §§ 11111(a)(1), 11112(a) (1994).

alleged fraud, even though Davies, as recipient of the mailed notices and telephone calls allegedly constituting the mail and wire fraud, and as the subject of the peer review, had the ability to obtain the necessary information to state the circumstances of the communications and peer review alleged to constitute the fraud. In light of the circumstances of this case, Plaintiffs' conclusory allegations fail to satisfy the requirement in Rule 9(b) of the Federal Rules of Civil Procedure for stating allegations of fraud with particularity, and therefore the allegations cannot be relied on to show a continuing pattern of fraudulent acts. *See Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989) (cited with approval on other grounds in *Lambert Plumbing,* 934 F.2d at 981). These allegations thus lack the specificity needed to show a threat of continuing racketeering activity. *See Menasco,* 886 F.2d at 684. The Court holds Plaintiffs have not stated a claim for violation of civil RICO.

### 3. *Proximate Cause*

■■■ The hospital's Judicial Review Committee reversed the MEC's decision to suspend Davies and impose restrictions. The Board made the final decision concerning Davies' suspension and restrictions. Furthermore, Plaintiffs do not allege they are prevented from working at Genesis because of the peer review action, but because of Genesis' exclusive contract with A & A. Therefore, the harm Plaintiffs allege they incurred was not proximately caused by the alleged predicate acts of Defendants. *See Bowman,* 985 F.2d at 386–87; *De Wit,* 879 F.Supp. at 962.

Because Defendants were not final decision-makers in the peer review process, whatever scheme, if any, Defendants participated in was never going to be more than part of a peer review process that routinely uses mail and telephones, and such a scheme as pled cannot rise to the level of racketeering activity.

Plaintiffs have not adequately alleged that any defendant conducted the affairs of a RICO enterprise through a pattern of racketeering activity, including predicate acts that

caused harm to Plaintiffs. Therefore, the Court grants Defendants' Motions to Dismiss the first cause of action.

### B. *Sherman Act Violations (Counts II and III)*

Plaintiffs allege that Defendants conspired to restrain Plaintiffs' trade and monopolize trade in violation of Sections 1 and 2 of the Sherman Act. Defendants allege that Plaintiffs lack standing to bring these claims and have failed to adequately state the claims for relief in their Corrected Second Amended Complaint.[5]

### 1. *Standing*

■■■ To qualify for standing to maintain a private damages action under federal antitrust laws, a plaintiff must establish the following: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex damage apportionment. *Lovett v. General Motors Corp.,* 975 F.2d 518, 520 (8th Cir.1992) (citing *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 534–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Some courts have divided these factors into two prongs, requiring a plaintiff to show: (1) the plaintiff suffered antitrust injury; and (2) that he is a proper antitrust plaintiff, i.e., an efficient enforcer of the antitrust laws. *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1449 (11th Cir.1991) (cited on other grounds by *Read, M.D. v. Medical X-Ray Ctr., P.C.,* 110 F.3d 543, 546 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997)); *Baglio v. Baska,* 940 F.Supp. 819, 830 (W.D.Pa.1996), *aff'd,* 116 F.3d 467 (3d Cir.1997); *Leak v. Grant Med. Ctr.,* 893 F.Supp. 757, 762 (S.D.Ohio 1995), *aff'd,* 103 F.3d 129, 1996 WL 721695 (6th

---

**5.** Defendants also assert that Plaintiffs have failed to allege they are entitled to relief under the Clayton Act. Because Plaintiffs could easily remedy this deficiency in an amended complaint, the Court does not analyze the issue.

Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2408, 138 L.Ed.2d 175 (1997).

### a. Antitrust Injury

 Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *NCAA v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 103, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *see Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). A private plaintiff can recover on an antitrust claim only where the loss "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

 An antitrust, plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, and not just its own welfare. *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 641 (3d Cir. 1996) (affirming finding that orthopedic surgeon failed to establish he suffered antitrust injury as result of sham peer review that resulted in restriction of staff privileges; orthopedic services were still readily available to consumers in area, and surgeon could still practice medicine, only his ability to perform spine surgery at one hospital was extinguished).

 The injury alleged must be palpable and distinct, rather than abstract, conjectural or hypothetical. *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1296 (7th Cir.1993); *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.,* 917 F.Supp. 1282, 1301 (N.D.Ill. 1996) (granting motion to dismiss plaintiff anesthesiologist's Sherman Act, § 1, claim against hospital that allegedly used sham process to select exclusive provider of anesthesiology services and forced plaintiff to surrender staff privileges, where plaintiff stated conspirators intended to affect competition in Chicago and throughout nation and stated competition was restricted in hospital, but failed to assert palpable injury to competition in Chicago market, thus failing to allege antitrust injury; holding one hospital's staffing decision did not give rise to § 1 claim; "Injecting the powerful medicine of

the Sherman Act into [plaintiff's] staffing dispute would be like treating a hangnail with amputation of the finger.").

Most courts addressing the issue have held that a mere staffing decision at a single hospital affecting a single practitioner, absent harm to a relevant market, did not violate the Sherman Act, and some of those courts have based their holdings on lack of standing and/or antitrust injury. *Mathews,* 87 F.3d at 641, *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n,* 36 F.3d 664, 668 (7th Cir.1994) (citing exhaustive list of decisions, commenting that in vast majority of cases, plaintiff physicians were denied relief; dismissing at summary judgment stage for failure to state claims, because plaintiffs failed to establish antitrust injury where anesthetists' contract with hospital was terminated in favor of other anesthetists); *Oksanen v. Page Mem. Hosp.,* 945 F.2d 696, 709 (4th Cir.1991) (en banc) (affirming district court's summary judgment, holding physician whose privileges were revoked did not establish antitrust injury), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *Baglio,* 940 F.Supp. at 829 (holding termination of doctor's staff privileges and position as director of pathology laboratory, and damage to his reputation did not constitute antitrust injuries, and therefore doctor lacked standing, where doctor's termination did not cause injury to consumers, because laboratory continued to operate under direction of several other pathologists); *Leak,* 893 F.Supp. at 763 (holding physician and corporation did not suffer antitrust injury, where they could compete with others offering pain-related medical services at two other area hospitals, even though plaintiffs were foreclosed from offering services to segment of patients whose managed-care plans limited them to defendant hospital, which had entered exclusive contract with another provider of anesthesia services and had denied staff privileges to plaintiffs; noting court would have reached same decision under motion to dismiss as under motion for summary judgment); *Robles v. Humana Hosp. Cartersville,* 785 F.Supp. 989, 998, 998 n. 7 (N.D.Ga.1992) (holding obstetrics physician who lost hospital staff privileges following peer review had

**1094**

not suffered antitrust injury and therefore lacked standing).[6]

█ In Count II, Plaintiffs allege Defendants' acts have harmed competition in the relevant market, which they define as the provision of cardiac anesthesiology services to patients in the Quad Cities area, an area they define as encompassing 23 Iowa and Illinois counties. (Corr.Sec.Am.Compl. at 19, ¶ 87).

Plaintiffs contradict this market definition, however, in their Corrected Second Amended Complaint. Plaintiffs make many more factual allegations concerning anesthesiology or general medical care than about cardiac anesthesiology, and Plaintiffs' factual assertions indicate the relevant market is the provision of anesthesiology services. For example, Plaintiffs make the following statements in their Corrected Second Amended Complaint: "Genesis' scheme to control the delivery of medical care in the Quad Cities, and surrounding areas," (*id.* at 2); "defendants have dictated the flow of anesthesiology referrals by controlling the delivery of anesthesia," (*id.* at 2, ¶ 2); "Davies [and] ... shareholders of APC, all of whom are medical doctors providing anesthesia services to patients in the Iowa–Illinois Quad Cities, and surrounding areas," (*id.* at 4, ¶ 9); "[Plaintiffs] have provided medical services, including anesthesia services," (*id.* at 7, ¶ 25); "conducting a bidding process to select a single anesthesia provider," (*id.* at 10, ¶ 40); "A & A ... was offered an exclusive contract to provide anesthesia services at St. Luke's hospital ... [which] would have precluded [plaintiffs] from delivering anesthesia services," (*id.* at 10, ¶ 44); "give the exclusive contract to A & A [Genesis'] favored group of anesthesiologists," (*id.* at 11, ¶ 51); "awarded an exclusive contract, to provide anesthesia services at Genesis, to A & A," (*id.* at 12, ¶ 54); "contract ... deprived consumers of the

competition of other anesthesiologists," (*id.* at 12, ¶ 56); "Davies ... was prevented by this contract from providing anesthesia services at Genesis," (*id.* at 12, ¶ 58); "prevent Dr. Davies from continuing to provide medical care at Genesis," (*id.* at 14, ¶ 66); and, "Davies ... was permanently prohibited from providing anesthesia services at Genesis," (*id.* at 15, ¶ 69).

Essentially, Plaintiffs allege that they provide anesthesiology services, and that among their consumers are cardiac patients. They do not state that the anesthesiology services they provide cardiac patients differ substantially from general anesthesiology services. Nor do they allege that any other physician anesthesiologists cannot provide the same services they provide to cardiac patients. Accepting the facts stated in the complaint as true, the Court concludes that Plaintiffs' claims appear merely to infer that a segment of Plaintiffs' anesthesiology business has been closed to them through the exclusive contract and Davies' loss of staff privileges. *See Leak,* 893 F.Supp. at 763.

Plaintiffs rely on *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 875 (3d Cir.1995), for the proposition that a physician's allegation that he has been excluded from the relevant market and that such exclusion constitutes an unreasonable restraint on trade constitutes a sufficient allegation of antitrust injury. *Brader,* however, unlike this case, concerned a hospital's suspension of a physician, through use of unfair proceedings and for no reasonable basis related to performance reasons, and the hospital's dissemination of a report about the doctor's suspension, which allegedly prevented the doctor from obtaining another position and caused a reduction in the provision of medical services in the Pittsburgh market. *Id.* at 871–72.

**6.** Unpublished decisions have reached the same conclusion. *See, e.g., Patel v. Scotland Mem. Hosp.,* 91 F.3d 132 (unpublished table decision), No. 95–2704, 1996 WL 383920, at *4 (4th Cir. July 10, 1996) (dismissing for failure to state Sherman Act claim, where nurse anesthetist failed to adequately allege facts necessary to demonstrate antitrust injury; complaint focused on injuries anesthetist incurred, not those the competitive market incurred; stating anesthetist alleged only staffing decision and personal economic injury); *Huhta v. Children's Hosp. of Philadelphia,* No. Civ.A. 93–2765, 1994 WL 245454, at *2 (E.D.Pa. May 31, 1994) (holding pediatric cardiologist's loss of referrals and lost revenue as result of hospital's bar to him using pediatric cardiology equipment and facilities was not antitrust injury; "The harm alleged in the complaint is really only harm to the individual doctor, and not to competition within the marketplace"), *order aff'd,* 52 F.3d 315 (3d Cir.1995).

Here, Plaintiffs have pleaded no facts from which a reasonable inference can be drawn that Defendants made a concerted effort to keep Plaintiffs from practicing in the Quad Cities area or elsewhere. In fact, Plaintiffs' factual pleadings belie such an allegation. Plaintiffs asserted that Davies continued to work at Genesis for a period after the exclusive contract was awarded to A & A and after the peer review. A reasonable inference can be drawn that APC will once again have the opportunity to bid on the exclusive contract when it is open for renewal. Furthermore, as noted previously, the hospital's Judicial Review Committee reversed the MEC's decision to suspend Davies and impose restrictions, and the Board made the final decision concerning Davies' suspension and restrictions. Plaintiffs do not allege they are prevented from working at Genesis because of the peer review action, and Davies does not allege why he was ultimately foreclosed from practicing at Genesis in February 1997.

■ Although Plaintiffs' assertions nominally regard prices and competition, the type of injury covered under antitrust laws, Plaintiffs have not alleged any palpable change in the market. The mere allegation that prices have or will increase in the future is insufficient for antitrust injury; a plaintiff must allege that prices will increase above competitive levels. *Robles,* 785 F.Supp. at 998, 998 n. 7. Plaintiffs claimed that doctors left APC to join A & A, which means patients now have more concerning which anesthesiologist to use, and which means Genesis is a more competitive hospital with the addition of new anesthesiologists. *Id.* at 998.

The relevant markets possibly affected by the exclusive contract granted to A & A were (1) the consumers of anesthesiology services, and (2) the providers of anesthesiology services. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 7, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Balaklaw v. Lovell,* 14 F.3d 793, 798 (2d Cir.1994). From the consumers' viewpoint, "[W]hat occurred after the implementation of the [exclusive] contract ... was only a reshuffling of competitors." *See Balaklaw,* 14 F.3d at 798 (quoting *Coffey v. Healthtrust, Inc.,* 955 F.2d 1388, 1392 (10th Cir.1992)). In both *Balaklaw* and *Coffey,* as here, the plaintiff doctor or group

had a de facto exclusive arrangement with a hospital to provide certain medical services, but was replaced when the hospital entered into an exclusive contract with another provider. *See Balaklaw,* 14 F.3d at 798 n. 10; *Coffey,* 955 F.2d at 1390. The same situation has occurred here.

From the providers' viewpoint, the Court notes Plaintiffs stated that competition for the exclusive contract regarded all Genesis' anesthesiology services, not just services for cardiac patients. Genesis solicited proposals from several anesthesiologists. Nothing in the Corrected Second Amended Complaint identified any competitors for Plaintiffs in the market for cardiac anesthesiology. The only competitors mentioned were those for the provision of all anesthesiology services at Genesis. Plaintiffs have not asserted any facts tangibly indicating that either the anesthesiology or asserted cardiac anesthesiology market has been hampered by the exclusive contract.

In assessing the sufficiency of Plaintiff's claim, the Court cannot ignore commercial realities. *See United States v. Grinnell Corp.,* 384 U.S. 563, 572–73, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Balaklaw,* 14 F.3d at 799; *Oksanen,* 945 F.2d at 709 ("[T]he relevant market definition must encompass the realities of competition."). Within the Quad Cities and the surrounding 23–county area, several cities have hospitals, and a few miles from the edges of the area defined by Plaintiffs, large hospitals are found in several cities, such as Iowa City, with the University of Iowa Hospital and Clinics, and including Chicago, Rockford, Peoria, and Springfield, Illinois. (*See* Appendix A.) Plaintiffs do not allege any facts suggesting the contract or staffing decision caused them, or other anesthesiologists, to be excluded from, or limited in, the market for anesthesiology services. *See Balaklaw,* 14 F.3d at 799. It therefore appears extremely unlikely that the Sherman Act prohibits Defendants' conduct.

The Court recognizes that under certain circumstances, a staffing decision can conceivably support an antitrust claim. *Cf. Islami v. Covenant Med. Ctr., Inc.,* 822 F.Supp. 1361, 1387 (N.D.Iowa 1992) (denying motion for summary judgment on basis of injury to

relevant market, where geographic market was in dispute, and evidence of injury to competition existed in form of one doctor's monopoly on thoracic surgeries at hospital, and of radiologists' possible monopoly on testing at lab).

In this case, however, considering all the facts stated in the Corrected Second Amended Complaint as true, taking into account the contradictions in the complaint regarding the nature of the market, and absent factual allegations raising a reasonable inference of injury to competition or of a causal connection between an alleged antitrust violation and harm to Plaintiffs, the Court holds Plaintiffs have alleged injury only to themselves and thus have not alleged the antitrust injury essential to their claim under antitrust law. *Cf. BCB Anesthesia*, 36 F.3d at 669 (holding that before court engaged "in the micromanagement of the staffing arrangements ... under the aegis of the antitrust laws," court needed "better reasons than the plaintiffs have given."). Plaintiffs, therefore, have not established antitrust standing, and the Court need not address the remaining factors regarding antitrust standing. *See Lovett*, 975 F.2d at 520–21.

■■■ Even if Plaintiff's had adequately pleaded antitrust injury, the Court holds they have not satisfied the second prong of that antitrust standing test: Plaintiffs have not shown they are the proper antitrust plaintiffs.

Other courts have determined that physicians challenging termination of staff privileges at a hospital are not appropriate plaintiffs to enforce antitrust laws. *See Todorov*, 921 F.2d at 1455 (holding doctor's interests were not aligned with patients' interests, where doctor would benefit from radiologists' inflated prices; patients, their insurers, or government were interested in ensuring consumers paid competitive price, and they could bring antitrust action); *Baglio*, 940 F.Supp. at 830 (holding even if doctor had established antitrust injury, he was not appropriate plaintiff to represent interests of those who might use pathology lab; patients and larger payors, who would be directly injured by alleged antitrust violations, must bring action); *Leak*, 893 F.Supp. at 764 (noting existence of "at least two more easily

imagined efficient enforcers": patients and the government).

Here, Plaintiffs might benefit if A & A charged patients inflated prices on procedures both perform, because consumers would have an added incentive to seek these anesthesiology services from Plaintiffs. Thus, Plaintiffs would not be the appropriate parties to raise this issue, because they would not be directly injured by the prices charged by A & A.

Because Plaintiffs have not shown they suffered antitrust injury and that they are proper antitrust plaintiffs, the Court grants Defendants' Motions to Dismiss the second and third causes of action.

Because Plaintiffs have not pleaded an antitrust injury, the Court need not address the adequacy of Plaintiffs' pleadings regarding the statement of their claims for relief under Sections 1 and 2. *See Brunswick*, 429 U.S. at 489; *Midwest Communications, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444, 450 (8th Cir.1985) (where plaintiff fails to establish threshold issue of antitrust injury, it lacks standing to sue under antitrust laws and court need not reach merits of antitrust claims), *cert. denied*, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). Nevertheless, the Court analyzes the balance of the grounds for the Motions to Dismiss the Sherman Act claims, because of the issues' importance and for the sake of efficiency should this case be considered on appeal.

### 2. Section 1 Claim (Count II)

Defendants seek to dismiss Count II of Plaintiffs' complaint for failing to state a claim under Section 1 of the Sherman Act.

■■■ "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ...." 15 U.S.C.A. § 1. In passing the Sherman Act, Congress intended to outlaw only unreasonable restraints. *State Oil Co. v. Khan*, —— U.S. ——, ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997).

Plaintiffs claim that by awarding an exclusive contract and conducting a fraudulent

peer review, Defendants have adversely affected the provision of anesthesiology services to cardiac patients and restrained Plaintiffs' business.

An alleged trade restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held per se unreasonable, or because it violates the rule of reason, under which the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Flegel v. Christian Hosp. Northeast–Northwest,* 4 F.3d 682, 686 (8th Cir.1993) (quoting *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457–58, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)). A plaintiff need not prove the anticompetitive effects of a restraint within a class subject to per se analysis. *Flegel,* 4 F.3d at 686; *cf. Klor's, Inc. v. Broadway–Hale Stores,* 359 U.S. 207, 210, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (cited in *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991)).

Most antitrust claims are analyzed under the rule of reason. *Kahn,* — U.S. at —, 118 S.Ct. at 279. Federal courts generally examine the denial or revocation of hospital privileges under the rule of reason. *Id.* (citations omitted); *Lie v. St. Joseph Hosp. of Mount Clemens,* 964 F.2d 567, 570 (6th Cir. 1992).

Plaintiffs do not assert, and the Court does not find, that Plaintiffs' claims fit within a class of restraints that have been held to be per se unreasonable. The Court therefore will analyze Plaintiffs' Section 1 claim under the rule of reason. To adequately allege the illegality of a restraint of trade under the rule of reason, a complaint must define a relevant market, and refer to genuine market-wide anticompetitive effects, actual or probable. *Flegel,* 4 F.3d at 688; *see also Double D Spotting Service, Inc. v. Supervalu, Inc.,* 136 F.3d 554, 558 (8th Cir. 1998) (dismissing complaint for failure to plead valid relevant market).

Because Plaintiffs have not asserted actual detrimental effects on competition,[7] the Court must examine the claims that Defendants have market power. *Flegel,* 4 F.3d at 688; *accord, Double D Spotting Service,* 136 F.3d at 558 To establish a defendant has market power, a plaintiff must identify the relevant market and the effect on that market of the defendant's alleged acts in restraint of trade. *Flegel,* 4 F.3d at 688; *Princess House, Inc. v. Lindsey,* 918 F.Supp. 1356, 1370 (W.D.Mo.1994). In defining a relevant market, a plaintiff must adequately define both a product and geographic market. *United States v. Mercy Health Servs.,* 107 F.3d 632, 634 n. 3 (8th Cir.1997); *FTC v. Freeman Hospital,* 69 F.3d 260, 268 (8th Cir.1995); *Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir.1994), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995); *Ryko Manufacturing Co. v. Eden Services,* 823 F.2d 1215, 1233 (8th Cir.1987) (stating plaintiff attacking vertical nonprice restraint must prove defendants' substantial market power in relevant market), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

"The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's [Rule] 12(b)(6) motion." *Double D Spotting Service,* 136 F.3d 554, 558 (quotation omitted).

The Court recognizes that to injure or destroy one or two competitors in a market through unfair competition will not, if the market has many competitors, substantially affect consumers or anyone else besides the competitors injured. *See Sutliff, Inc. v. Donovan Co., Inc.,* 727 F.2d 648, 655 (7th Cir.1984). Mere unfair competition, without more, does not violate antitrust laws. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

Similarly, a complaint that "does no more than state plaintiff's commercial disap-

---

**7.** Plaintiffs asserted A & A raised prices, but do not specify for which services prices were raised, or that the prices were raised higher than to a competitive level.

As discussed above, Plaintiffs have not adequately pled a causal connection between harm to Plaintiffs and any alleged concerted action by Defendants in violation of the Sherman Act.

pointment" at losing a segment of business is insufficient as a matter of law to rise to the level of an antitrust violation within a relevant market. *Double D Spotting Service,* 136 F.3d 554, 561 (affirming district court's dismissal of complaint, where complaint did no more than state plaintiff's disappointment at not receiving exclusive contract at one warehouse). "Hospitals are not public utilities, required to grant staff privileges to anyone with a medical license." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,* 65 F.3d 1406, 1413 (7th Cir.1995), *cert. denied,* 516 U.S. 1184, 116 S.Ct. 1288, 134 L.Ed.2d 233 (1996).

### a. Product Market

■ Products are in the same market when they are "reasonably interchangeable" for the same uses, thus exhibiting a high "cross-elasticity of demand" from buyers. *Community Publishers, Inc. v. Donrey Corp.,* 892 F.Supp. 1146, 1153 (W.D.Ark. 1995); *see United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 381, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 380, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). A high cross-elasticity of supply, i.e., substitution by sellers, must also be considered in determining a relevant product market. *Blue Cross,* 65 F.3d at 1411 (holding definition of submarkets of specific, very narrowly defined medical procedures was unrelated to conditions of supply, where many physicians performed or could perform more than one procedure, and therefore were part of the market if not active in it; holding health maintenance organizations did not constitute market separate from other contractual forms in which many of same doctors sold their services); *see General Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 805 (8th Cir.1987), *cert. denied,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *cf. Lee v. Life Ins. Co. of North America,* 23 F.3d 14, 17 (1st Cir.1994) (affirming dismissal of § 1 claim; appellants could assert no colorable claim that university had appreciable economic power in market for university education or market for health care services, where university competed for students on regional and national level with several universities and colleges, and although universi-

ty was "unique" in colloquial sense, appellants could not claim other institutions did not or could not provide functionally similar educational offerings); *Midwest Radio Co. v. Forum Publishing Co.,* 942 F.2d 1294, 1297 (8th Cir.1991) (holding proposed definition of relevant product market for mass media advertising was too narrow as a matter of law).

■ A court may determine the boundaries of an antitrust market by analyzing such indicia as industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers or prices, sensitivity to price changes, and specialized vendors. *Brown Shoe,* 370 U.S. at 325; *Community Publishers,* 892 F.Supp. at 1153.

■ Market definition is not determined by formal labels, but rather takes into account "the realities of competition." *Weiss v. York Hosp.,* 745 F.2d 786, 826 (3d Cir. 1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *accord, Langenderfer v. S.E. Johnson Co.,* 917 F.2d 1413, 1421 (6th Cir.1990) (stating market must correspond to commercial realities of industry; following *Brown Shoe,* 370 U.S. at 336–37). Determination of the competitive market depends on how different from one another the offered products are in character or use. *du Pont,* 351 U.S. at 393. For example, differences exist in the formulas for soft drinks, but each one is not an illegal monopoly. *Id.; see Times–Picayune Publ. Co. v. United States,* 345 U.S. 594, 613, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (holding readership "bought" by advertisers in morning newspaper was sane "product" sold by evening newspaper, where nothing suggested advertisers viewed city's morning or evening newspaper readers as other than fungible customer potential).

■ The Sherman Act does not require that products be fungible to be considered in the relevant market. *du Pont,* 351 U.S. at 394. "In determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control." *Id.* at 395.

■ Here, Plaintiffs allege the relevant market is cardiac anesthesiology services, a submarket of anesthesiology services. As

discussed above, Plaintiffs contradict this allegation through their many factual assertions regarding general medical care and anesthesiology services. Furthermore, Plaintiffs make no allegations distinguishing the cardiac anesthesiology market from the anesthesiology market in terms of being recognized as a separate economic entity by the industry or public, having peculiar characteristics and uses, requiring unique facilities, featuring distinct prices or sensitivity to price changes, and requiring specialized training. *See Brown Shoe,* 370 U.S. at 325.

Distinct customers, specifically those patients requiring invasive cardiac surgery, are the only indicia that can be inferred from the Corrected Second Amended Complaint as supporting Plaintiffs' narrow product market definition. However, Plaintiffs make no allegations that physician anesthesiologists who offer cardiac anesthesiology services at Genesis are not interchangeable with other physician anesthesiologists, and thus that there are no comparable alternatives available and no cross-elasticity of demand between the services offered by anesthesiologists who provide cardiac anesthesiology and services offered by substitutes for these physicians. *See Id.* Plaintiffs fail to explain how cardiac anesthesiology services are unique and the reasons they have no substitute. The realities of competition in this case are that the cardiac patients could easily have switched from the Plaintiffs to other anesthesiologists, which many presumably did when Genesis chose a new provider group, and thus a high elasticity of demand exists.

Furthermore, a high elasticity of supply exists. The only factual information given relates to Genesis' use of, and staffing patterns for, anesthesiologists. Plaintiffs state that when Genesis sought bids for its exclusive contract for anesthesiology services, it sent information to all anesthesiologists with staff privileges. Plaintiffs do not contend that A & A, the contract winners, are specialists in cardiac anesthesiology. The facts pled imply that other anesthesiologists can supply anesthesiology to cardiac patients.

Because of the length and complexity of cardiac surgery, providing anesthetics during such surgery is likely to require the use of more time and experience and of increased anesthetics than are required during many other types of surgery. This additional input, however, is not enough to carve out a separate market for the provision of anesthetics during cardiac surgery from the market of anesthesiology services; physicians commonly expend more time and skill during certain procedures as compared to others. *See Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467, 1471 (9th Cir.1985) (holding nurse anesthetists and M.D. anesthesiologists competed in same market even though nurse anesthetists required "input" of physician's supervision, where supervision was easily obtainable and common practice in medical profession), *cert. denied,* 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991).

Davies cannot make a colorable claim that other physician anesthesiologists do not or cannot provide anesthesiology for cardiac surgery. *Cf. Blue Cross,* 65 F.3d at 1411; *Lee,* 23 F.3d at 17. Davies' narrow definition of a submarket of cardiac anesthesiology services thus appears unrelated to conditions of supply and demand and fails to take into account the economic realities of the marketplace.

Absent the existence of any other of the specific factors listed in *Brown Shoe,* and considering the contradictory assertions in the Corrected Second Amended Complaint, the Court holds that Plaintiffs' claim of a narrow market for cardiac anesthesiology is insufficient as a matter of law to establish the relevant product market. Plaintiffs therefore cannot identify the effect on the relevant market of Defendants' alleged restraint of trade. *See Flegel,* 4 F.3d. at 688.

### b. Geographic Market and Market Power

The geographic market encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which antitrust defendants face competition. *Morgenstern,* 29 F.3d at 1295 (citing *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 331–32, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). The *Morgenstern* court recognized the importance of distance and convenience in determining the relevant geographic market. *Morgenstern,* 29 F.3d at 1297 (holding as a matter of law that facts did not support proposed relevant market of adult cardiac surgery patients to include Lincoln, Nebraska, and 26 surrounding Nebraska counties extending over 200 miles beyond

Lincoln in certain directions, while excluding heart programs in Omaha, to which Lincoln residents needed to travel only 58 miles by main highway, and programs in other regional and national heart programs).

 A geographic market is determined by inquiring into the commercial realities faced by consumers. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 452–56, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Freeman Hospital*, 69 F.3d at 270 (holding plaintiff failed to meet burden of establishing relevant market, where expert's analysis based on zip code data gave "a static, rather than a dynamic, picture of that acute care market," by addressing only the question of where patients currently went, rather than where they could practicably go for services); *Bathke v. Casey's General Stores*, 64 F.3d 340, 345 (8th Cir.1995) (affirming district court's entry of summary judgment against plaintiffs, where gasoline retailers in 67 small Iowa towns sued multi-state retailer of gasoline for alleged predatory pricing and tried to establish each small town as separate geographic market for gasoline, but failed to show where consumers could practicably travel to avoid buying gas at a Casey's store); *United States v. Mercy Health Servs.*, 902 F.Supp. 968, 981 (N.D.Iowa 1995), *vacated as moot*, 107 F.3d 632 (8th Cir.1997) (holding relevant geographic market was not county in which hospitals were located and half-circle within 15-mile radius extending from county's edge; significant number of Dubuque, Iowa, residents used University of Iowa Hospitals and Clinics in Iowa City, a 90–mile drive, due to factors including quality and price concerns).

 The market for a hospital's specialized medical services may encompass a broader geographic area than the market for its general medical services. *Freeman Hospital*, 69 F.3d at 271 (noting that as patients came to three Joplin, Missouri, hospitals to receive specialized, sophisticated services, hospitals in larger cities in four-state area, such as Springfield and Kansas City, Missouri, or Tulsa, Oklahoma, might become viable competitive alternatives to Joplin hospitals).

 In the instant case, Plaintiffs' allegations do not address the critical question of where consumers of cardiac anesthesiology services could reasonably turn for alternative care.

The Corrected Second Amended Complaint states Genesis is the only hospital in the Quad Cities and surrounding area that provides invasive cardiology and cardiac surgery care. Plaintiffs describe the surrounding area as comprising 23 counties, but do not identify which counties are in which states. A map shows the following listed counties are in Iowa: Cedar, Clinton, Jackson, Jones, Louisa, Muscatine, and Scott, and the following counties are in Illinois: Carroll, Bureau, Hancock, Henderson, Knox, Marshall, McDonough, Mercer, Ogle, Putnam, Rock Island, Stark, Warren, and Whiteside. The Corrected Second Amended Complaint lists two counties, Henry and Lee, that could be in either Iowa or Illinois. The area stretches approximately 200 miles north to south in Illinois, and approximately 100 miles north to south in Iowa. The area extends in some locations to approximately 100 miles wide.

In Iowa, parts of Louisa, Muscatine, Cedar, and Jones counties are closer to the University of Iowa Hospital and Clinics (UIHC) in Iowa City, Iowa, than to the Quad Cities. (*See* Appendix A.) Davenport is approximately 56 miles from Iowa City. UIHC provides surgical services and is easily accessible to many residents of these counties by interstate and state highways.[8] Similarly, in Illinois, cardiac services and surgery are easily accessible by interstate and state highways to many residents of

8. The Court cannot ignore the commercial reality, well known in Iowa, that UIHC is a major tertiary care center, any more than it could ignore in an antitrust case involving proposed markets for county fairs the existence of the Iowa State Fair in Des Moines.

As noted in another case, "[A] significant number of Dubuque residents use the University of Iowa Hospitals and Clinics ... a ninety mile drive, due to quality concerns." *Mercy Health Servs.*, 902 F.Supp. at 982. Therefore, it is reasonable to assume that a significant number of Quad Cities residents use the UIHC, which for them is approximately a 56–mile drive. Not to consider the impact of UIHC on this market would be similar to ignoring an elephant in the room.

counties in the designated geographic market. Reviewing the areas identified by Plaintiffs as relevant, it appears that portions of McDonough and Hancock Counties are closer to Springfield, the location for Southern Illinois University's medical school and hospital, than to the Quad Cities. Areas of Ogle and Lee Counties are closer to Chicago, home to several medical schools, hospitals and medical centers, than to the Quad Cities. Ogle County abuts the city of Rockford (population approximately 139,426), and portions of Bureau, Marshall, Stark, and Knox counties are closer to Peoria (population approximately 111,504) than to the Quad Cities. considering these populations, it would be unreasonable to infer residents of the Quad Cities area could not practicably turn to hospitals in Rockford or Peoria for cardiac surgery.

A proper market definition can most often be determined only after a factual inquiry into the commercial realities facing consumers. *Double D Spotting Service,* 136 F.3d at 560. "This general rule, however, does not amount to a per se prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed.R.Civ.P. 12(b)(6)." *Id.* (internal quotations omitted).

In assessing the sufficiency of Plaintiff's claim under Fed.R.Civ.P. 12(b)(6), the Court cannot ignore blatant geographic and commercial realities referenced by the pleadings. As a matter of law, Plaintiffs' stated geographic market is too narrow to support the claimed antitrust violation *See Double D Spotting Service,* 136 F.3d at 560 (dismissing antitrust claim on grounds geographic market alleged to be one Supervalu warehouse in suburb was too narrow to support claim, stating, "the market for [truck] unloading services would seem to be more properly defined as including all warehouses within, at least, the entire ... metropolitan area, if not an even larger area."). Facts in the Corrected Second Amended Complaint do not ade-

quately identify a relevant geographic market, and therefore Plaintiffs cannot establish market power by identifying the effect on the relevant market of Defendants' alleged restraint of trade. If not, then injuring Plaintiffs might have no effect on the market as distinct from the harm to Plaintiffs.

The Court holds the factual allegations in Plaintiffs' Corrected Second Amended Complaint do not adequately plead the existence of a relevant product and geographic market and therefore do not state a Section I antitrust claim. The Court grants Defendants' Motions to Dismiss the second cause of action.

### 3. Section 2 Claim (Count III)

Section 2 provides that, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fines not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C.A. § 2.

Plaintiffs allege Defendants violated Section 2 by monopolizing, attempting to monopolize, and forming a conspiracy to monopolize the market for cardiac anesthesiology.

To avoid dismissal of its complaint, a plaintiff asserting a claim under Section 2 must allege a relevant product and geographic market. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (attempt to monopolize) *Double D Spotting Service,* 136 F.3d at 560 (same) *Morgenstern,* 29 F.3d at 1295–96 (monopolize); *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1182 (8th Cir.1982) (conspiracy) [9], *cert. denied,* 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313, 461 U.S. 938, 103

---

**9.** The Eighth Circuit does not require as rigorous a showing for the relevant market in the context of a conspiracy claim as for a showing for the relevant market for other Section 2 claims. *See Alexander,* 687 F.2d at 1182 (holding civil conspiracy claim, standing alone, requires at least minimal showing of product and geographic context to ensure claim is not based on some abstract showing of unlawful intent). Even apply-

ing a less rigorous standard than for Plaintiffs' other Section 2 claims, the Court holds that for the reasons outlined above, Plaintiffs have not adequately pled the showing of a relevant market required for a Section 2 conspiracy claim. To hold otherwise would permit a fact finder to infer a conspiracy where such an inference is implausible. *Cf. Matsushita Elec. Indus. Co. v.*

S.Ct. 2110, 77 L.Ed.2d 314, *and* 461 U.S. 939, 103 S.Ct. 2110, 77 L.Ed.2d 314 (1983); *accord TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1028 (10th Cir.), *cert. denied,* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992) (affirming dismissal of amended complaint because plaintiff "did not allege a relevant product market which [defendant] was capable of monopolizing, attempting to, or conspiring to monopolize"); *B.V. Optische Industrie de Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162 (S.D.N.Y.1995) (dismissing § 2 attempted monopoly claim, where plaintiff failed to adequately show relevant product market was chest equalization radiography and that no other persons besides parties had capacity to provide radiography equipment in United States; plaintiff did not refer to any reasonably interchangeable alternatives and did not explain why market was defined in such narrow terms).

■ An exclusive provider contract, without more, does not violate Section 2. *Vakharia,* 917 F.Supp. at 1302 (noting Seventh Circuit had long since determined that, a single hospital's staffing decision did not give rise to § 2 claim).

For the reasons discussed above, Plaintiffs have not adequately pled a relevant product or geographic market. Therefore, the Court holds that Plaintiffs' complaint does not state a Section 2 antitrust claim. The Court grants Defendants' Motions to Dismiss the third cause of action.

### C. Title VII (Count IV)

Plaintiffs assert A & A discriminated against Davies in employment because of his

*Zenith Radio Corp.,* 475 U.S. 574, 593, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (analyzing market in context of whether alleged conspirators had plausible chance of achieving monopoly in market, and therefore motive for conspiring; stating courts should not permit fact finders to infer conspiracies when such inferences are implausible, because otherwise procompetitive conduct could be deterred).

**12.** The Court notes that several courts have determined that shareholders in professional corporations were not "employees" for purposes of determining whether a corporation had the required number of employees to qualify as a "employer" under Title VII. *See Devine v. Stone, Leyton & Gershman,* 100 F.3d 78, 82 (8th Cir.

national origin. He was born and educated in South Wales.

■ Defendant A & A argues, and Plaintiffs admit, that Plaintiffs' complaint does not properly identify A & A as an employer as defined in 42 U.S.C. § 2000e(b), which is required for federal court, jurisdiction. Specifically, Plaintiffs do not claim that A & A "has fifteen or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).[12]

The Court is limited to a review of the pleadings under a Fed.R.Civ.P. 12(b)(6) motion to dismiss. Because Plaintiffs have not pled any facts identifying A & A as an employer as defined in 42 U.S.C. § 2000e(b), including whether A & A has fifteen or more employees, the Court grants A & A's Motion to Dismiss this claim.

### D. Supplemental State Claims (Counts V to IX)

Having granted Defendants' RICO, Sherman Act, and Title VII claims, the Court turns to the remaining supplemental state claims in Counts V to IX. Of these, Defendants moved to dismiss Count V, Iowa Antitrust laws, and Count VII, defamation.

#### 1. Iowa Antitrust Laws (Count V)

Plaintiffs brought their state antitrust claim under Iowa Code § 553.5, which prohibits monopoly and the attempt to monopolize: "A person shall not attempt to establish or establish, maintain, or sue a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices."[13] Iowa Code § 553.5 (1996).

1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1694, 137 L.Ed.2d 821 (1997) (holding attorney shareholder-directors of professional corporation were not employees; adopting "form over substance" test); *Goudeau v. Dental Health Servs., Inc.,* 901 F.Supp. 1139, 1147 (M.D.La.1995) (holding dentist shareholders in professional corporation were not employees; where management, ownership, and control of corporation resembled that of partnership). However, because this is raised as a motion to dismiss, the Court makes no findings as to the number of employees A & A has.

**13.** "Relevant market" is defined as "the geographical area of actual or potential competition

Defendants rely on Iowa Code § 553.2 for the proposition that Plaintiffs' Iowa antitrust claims should be dismissed for the same reasons their federal antitrust claims are dismissed. Plaintiffs counter that the Corrected Second Amended Complaint states a valid cause of action under Iowa's Antitrust Laws.

Iowa Code § 553.2 provides as follows:

This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purposes as this chapter. This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.

Iowa Code § 553.2.

■ When interpreting Iowa antitrust statutes, Iowa courts are required by section 553.2 to give considerable weight to federal cases construing similar sections of the Sherman Act. *Neyens v. Roth*, 326 N.W.2d 294, 297–98 (Iowa 1932) (holding district court erred in concluding § 553.6(4)'s exemption applied to defendants; stating reasoning of United States Supreme Court case, filed after district court's ruling, required rejection of defendants' argument, even though federal statute regarding exemption for antitrust liability had different rationale than § 553.6(4)'s rationale); *accord Federal Land Bank of Omaha v. Tiffany*, 529 N.W.2d 294, 296 (Iowa 1995) (holding, because federal case law had held farm credit banks were not subject to federal antitrust law, such banks were exempt under Iowa antitrust law), *cert. denied*, 516 U.S. 1043, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996); *Northwestern Bell Tel. Co. v. Iowa Utils. Bd.*, 477 N.W.2d 678, 684–86 (Iowa 1991); *State v. Cedar Rapids Bd. of Realtors*, 300 N.W.2d 127 (Iowa 1981) (applying rule of reason from federal antitrust cases).

■ Section 553.5's prohibition against attempts to monopolize and monopolization closely resemble the Sherman Act, Section 2's, prohibition against attempts to monopolize and monopolization.[14] *See Double D Spotting Service*, 136 F.3d at 560.

■ Because Plaintiffs' claims of attempt to monopolize and monopolization are dismissed under Section 2 of the Sherman Act, which is similar to Section 553.5, and because Section 553.2 requires a "uniform application of state and federal laws prohibiting restraints of economic activity and monopolistic practices," the Court holds Iowa courts would interpret Section 553.5 to require dismissal of Count V.

Therefore, the Court grants Defendants' Motion to Dismiss Count V for the reasons discussed regarding dismissal of Count III.

#### 2. Counts VI to IX

Defendants did not challenge Count VI (intentional interference with contractual relations); Count VIII (intentional infliction of emotional distress), or Count IX (breach of contract). Defendants sought dismissal of Count VII (defamation).

■ Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise jurisdiction over the remaining state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Pioneer Hi–Bred Internat'l v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1242 (8th Cir.1994); *Moebus v. OB–Gyn Assocs., Inc.*, 937 F.Supp. 867, 870 (E.D.Mo.1996). The Court therefore will dismiss the remaining state law claims without prejudice. The Court anticipates that should Plaintiffs replead their defamation claim in state court, they will take into account the challenges to the claim Defendants raised here.

#### V. Conclusion.

Because Plaintiffs have not pled the conduct of an enterprise, a pattern of racketeering activity, or probable cause under RICO, the Court grants Defendants' motions to Dis-

---

in a line of commerce, all or any part of which is within this state." Iowa Code § 553.3(6).

**14.** The Sherman Act, Section 2's, prohibition against conspiracy to monopolize has a counter-

part in Iowa Code § 553.4, which also prohibits the restraint of trade: "A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code § 553.4.

**1104**

miss Count I. Because Plaintiffs lack federal antitrust standing, and have failed to state a claim for violation of Sections 1 and 2 of the Sherman Act, the Court grants Defendants' Motions to Dismiss Counts II and III. Because Plaintiffs have not identified Defendant A & A as an employer as defined in 42 U.S.C. § 2000e(b), the Court grants Defendant A & A's Motion to Dismiss Count IV. Giving considerable weight to federal cases construing sections of the Sherman Act that are similar to Iowa Code § 553.5, the Court grants Defendants' Motions to Dismiss Count V.

■ The Court dismisses the remaining state law claims, Counts VI through IX, without prejudice to Plaintiffs' right to assert their state law claims in state court.[15]

The Motions to dismiss (Clerk's Nos. 9, 11, 30, and 31) are granted, subject to Plaintiffs' right to assert their state law claims in state court.

IT IS SO ORDERED.

---

15. In their brief in resistance to Defendants' Motions to Dismiss, Plaintiffs requested leave to amend the Second Corrected Amended Complaint if the Court granted Defendants' motions. Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend "shall be given freely when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see In re NationsMart Corp. Securities Litigation*, 130 F.3d 309, 322 (8th Cir.1997). Permission to amend may, however, be denied where amendment would be futile. *Taylor v. United States*, 106 F.3d 833, 838 (8th Cir.1997).

Plaintiffs have not submitted a proposed amendment. Although approximately five months have passed since Defendants filed their motions to dismiss, Plaintiffs have made no attempt to remedy the defects in the Second Corrected Amended Complaint identified by Defendants. Plaintiffs have already amended their complaint twice, the second time in response to Defendants' first round of motions to dismiss. Nothing in Plaintiffs' brief in support of their resistance to the motions to dismiss indicates what a third amended complaint would have contained. "Absent some indication as to what might be added to the complaint to make it viable, the appellant is not entitled to leave to amend." *Wolgin v. Simon*, 722 F.2d 389, 395 (8th Cir.1983) (affirming district court's denial of leave to amend, where in brief in opposition to motion to dismiss, plaintiff requested leave to amend complaint, but did not submit proposed amendment; court could not rule on question of amendment, and granting leave to amend would have been inappropriate); *accord Clayton v. White Hall School District*, 778 F.2d 457, 460 (8th Cir.1985); *cf. Oliver v. Resolution Trust Corp.*, 955 F.2d 583, 584 (8th Cir.1992).

For these reasons, and because the contradictions between the facts pled and the claims asserted persuade the Court that any attempt to amend would be futile, the Court denies Plaintiffs' request to amend their complaint for a third time. *See Patel*, No. 95–2704, 1996 WL 383920, at *4.